[Cite as *Cronkelton v. Guaranteed Constr. Servs.*, 2013-Ohio-328.]

### IN THE COURT OF APPEALS OF OHIO
### THIRD APPELLATE DISTRICT
### LOGAN COUNTY

CLIFFORD A. CRONKELTON,
TRUSTEE OF THE CLIFFORD A.
CRONKELTON TRUST DATED
APRIL 8, 1994,

      PLAINTIFF-APPELLEE,                CASE NO. 8-12-01

      v.

GUARANTEED CONSTRUCTION
SERVICES, LLC, DBA GUARANTEED
ASSET MANAGEMENT, ET AL.,         O P I N I O N

      DEFENDANTS-APPELLANTS.

---

Appeal from Logan County Common Pleas Court
Trial Court No. CV-10-12-0605

**Judgment Affirmed**

Date of Decision: February 4, 2013

---

**APPEARANCES:**

    *James S. Savage and Douglas J. Segerman* for Appellants

    *Terrence G. Stolly and John D. Bodin* for Appellee

**PRESTON, P.J.**

{¶1} Defendants-appellants, Guaranteed Construction Services, LLC, d.b.a. Guaranteed Asset Management, and Patrick Shivley, appeal the Logan County Court of Common Pleas' jury verdict finding that they committed fraud and awarding compensatory damages, punitive damages, and attorney fees to plaintiff-appellee, Clifford Cronkelton. Appellants contend the jury's verdict was erroneous because Cronkelton's fraud claim was barred by the parol evidence rule, that Cronkelton unjustifiably relied on Shivley's statements, and that the award of punitive damages and attorney fees was unwarranted. For the reasons that follow, we affirm.

{¶2} The case before this Court stems from a real estate transaction for a foreclosed car wash in Bellefontaine, Ohio. (Doc. No. 1). On December 3, 2010, Cronkelton filed a complaint against appellants in the Logan County Court of Common Pleas following his purchase of the car wash. (*Id.*). Cronkelton asserted three causes of action: breach of contract, negligent misrepresentation, and fraud. (*Id.*). Cronkelton claimed that he had reasonably relied on Shivley's misrepresentations that the car wash had been properly winterized and sought compensatory damages, punitive damages, and attorney fees. (*Id.*). Appellants filed their answer on January 5, 2011. (Doc. No. 12).

{¶3} On March 21, 2011, appellants filed a motion for summary judgment. (Doc. No. 21).  On April 29, 2011, Cronkelton filed his response.  (Doc. No. 31). The trial court granted appellants summary judgment on the breach of contract and negligent misrepresentation claims, but denied appellants' motion for summary judgment on the fraud claim.  (Doc. No. 33).

{¶4} On October 25-27, 2011, the trial court held a jury trial on the fraud claim.  The jury returned a verdict for Cronkelton, awarding him compensatory damages of $43,671, punitive damages of $66,000, and found that the trial court should award Cronkelton attorney fees.  (Doc. No. 73).

{¶5} On November 8, 2011, the parties filed a stipulation for attorney fees for the amount of $30,000.  (Doc. No. 83).  On November 10, 2011, the trial court filed its judgment entry recording the jury's verdict for Cronkelton and awarding Cronkelton $43,671 in compensatory damages, $66,000 in punitive damages, and $30,000 for attorney fees.  (Doc. No. 86).

{¶6} On November 23, 2011, appellants filed a motion for judgment notwithstanding the verdict, and in the alternative, for a new trial or a remittitur of the punitive damages.  (Doc. No. 104).  On December 14, 2011, Cronkelton filed his motion in opposition.  (Doc. No. 115).  On January 20, 2012, the trial court filed its judgment entry denying appellants' motion.  (Doc. No. 158).

{¶7} On February 17, 2012, appellants filed a notice of appeal. (Doc. No. 171). Appellants now raise three assignments of error for our review.

**Assignment of Error No. I**

**The fraud claim is barred under the parol evidence rule.**

{¶8} In their first assignment of error, appellants argue the trial court erred by admitting evidence regarding Shivley's statements that the car wash would be winterized. Appellants contend that the parol evidence rule barred this evidence because it was contrary to the "as is" term of the purchase agreement.

{¶9} "The parol evidence rule states that 'absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements.'" *Galmish v. Cicchini*, 90 Ohio St.3d 22, 27 (2000), quoting 11 Williston on Contracts, Section 33:4, at 569-570 (4th Ed.1999). The parol evidence rule is a rule of substantive law that excludes extrinsic evidence to prove the content of an agreement. *Id*. "'The rule comes into operation when there is a single and final memorial of the understanding of the parties. When that takes place, prior and contemporaneous negotiations, oral or written, are excluded; or, as it is sometimes said, the written memorial supersedes these prior or contemporaneous negotiations.'" *Id*., quoting *In re Gaines' Estate*, 15 Cal.2d 255, 264-265 (1940). The parol evidence rule thus

protects the integrity of final, written agreements. *Paragon Networks Internatl. v. Macola, Inc.*, 3d Dist. No. 9-99-2, *4 (Apr. 28, 1999).

{¶10} However, one exception to the parol evidence rule applies when a party seeks to prove fraud in the execution or inducement of an agreement. *Id.* In the case of fraudulent inducement, the party will often claim that facts outside of the contract induced the party to enter into the agreement. *Id.* "'Parties may not, however, prove fraud by claiming that the inducement to enter into an agreement was a promise that was within the scope of the integrated agreement but was ultimately not included in it.'" *Id.*, quoting *Busler v. D & H Mfg., Inc.*, 81 Ohio App.3d 385, 390 (10th Dist.1992). Thus, "the parol evidence rule does apply 'to such promissory fraud if the evidence in question is offered to show a promise which contradicts an integrated written agreement. Unless the false promise is either independent of or consistent with the written instrument, evidence thereof is inadmissible.'" *Galmish* at 28, quoting *Alling v. Universal Mfg. Corp.*, 5 Cal.App.4th 1412, 1436 (1992). "'Thus, parol evidence can only be introduced to challenge a written contract when the alleged oral misrepresentations are *consistent* with the written contract.'" *D & H Autobath, LLC v. PJCS Properties I, Inc.*, 12th Dist. No. CA2012-05-018, 2012-Ohio-5845, ¶ 18, quoting *Westwinds Dev. Corp. v. Outcalt*, 11th Dist. No. 2008-G-2863, 2009-Ohio-2948, ¶ 58 (emphasis in original). Furthermore, an integration clause does not prevent a trial

court from admitting the evidence in the case of fraud because "the presence of an integration provision does not vitiate the principle that parol evidence is admissible to prove fraud." *Galmish* at 28.

{¶11} The application of the parol evidence rule is an issue of substantive law that is reviewed de novo on appeal. *Rice v. Rice*, 7th Dist. No. 2001-CO-28, 2002-Ohio-3459, ¶ 38. As a result, we review the application of the parol evidence rule without deference to the trial court's decision. *Arnett v. Precision Strip, Inc.*, 3d Dist. No. 2-11-25, 2012-Ohio-2693, ¶ 10.

{¶12} In the present case, the trial court admitted evidence regarding Shivley's representation that the property would be winterized. Cronkelton testified that he first inspected the foreclosed car wash at the end of November 2009. (Oct. 25, 2011 Tr. at 33). At that time, Cronkelton tested the equipment and knew that some of the pieces of equipment were fully functioning and some were not. (*Id*. at 34-35). Cronkelton made an offer on the property on December 1, 2009. (*Id*. at 36). Shortly thereafter, Cronkelton called Shivley to discuss the winterization of the property. (*Id*. at 37). Cronkelton testified:

> so I called him, said, hey, it's going to freeze here this week. I knew
> like December 10th or after it was going to freeze because I watch
> the weather pretty closely. It's supposed to get down to like ten
> degrees, have you got it winterized, you know. If it's not winterized,

-6-

I'm not interested in the property. If it freezes, I'm not interested in the property at all. And he guaranteed me. He said, no, it will be taken care of. We don't have a problem. That's my job as receiver. I'll take care of it.

(*Id.*). After the phone call, Shivley sent Cronkelton an email dated December 7, 2009 that stated:

As per our phone conversation Guaranteed Asset Management will winterize the Car Wash with the anticipation of reopening the wash in the near future. Within this Winterization we will put antifreeze and secure floor heating as well as blow water out of all lines in self serve bays as well as empty tanks, etc. We will leave the heat on at a minimal level in the pump room. We will take all brushes, wands and hoses off and leave in the storage facility. We will leave the Vac units attached and cut off all electric to the Vacs. We will clean up lot, including cutting bushes, trees, etc. where necessary and pick up all trash and empty cans on lot. We will lastly place a Chain at the entrance of the wash preventing cars, etc. into the parking lot. Please let me know if there is anything else you would like us to do. We will complete all of this on Wednesday, December 9, 2009.

(Plaintiff's Ex. 3). After Huntington Bank had not accepted Cronkelton's offer for several months, Cronkelton withdrew the offer. (Oct. 25, 2011 Tr. at 39-40). Shivley then contacted Cronkelton and indicated that Huntington Bank was open to another offer from him. (*Id*. at 40). Cronkelton testified, "I just asked him, I said was it all in good shape? It's still- you've got it winterized, everything is like it was? Yeah, nothing's changed. We had it all winterized. We took care of it- just as his e-mail says." (*Id*. at 40-41). Huntington Bank rejected Cronkelton's second offer, but finally accepted his third offer of $110,000. (Defendant's Ex. 1). Cronkelton testified that throughout the negotiations, he repeatedly asked Shivley about the winterization of the property, stating "[i]t just said everything still the same? We're good to go? You know the property's- you know, he said the property's good." (Oct. 25, 2011 Tr. at 42). Cronkelton testified that Shivley specifically told him the property had been winterized, "[t]hat's part of it. You've got it all winterized. We've got it take[n] care of, no problem." (*Id*.).

{¶13} Cronkelton testified that they closed on the property in June and he received the keys at that time. (*Id*. at 44). Cronkelton testified that he immediately went to the property:

> I opened the door, and the huge canisters that I was telling you about were all busted. The tops had been exploded off the top of them. At first when I opened the door I thought it had been vandalized. I

thought, wow, what happened to this property, you know. And then I close looked at it, seeing the tops exploded off and the side of one of the conditioners was broke, and all the- all the mineral that they use inside was all laying on the floor and it was tipped over and turned around and looked at the- the R/O, which is the other water conditioner, to keep it from spot free, it was all busted and the side was exploded on it. And I have pictures. I took my camera and took detail pictures. You could see pipes that were bursted, you know, had big old, you know, copper exploded. It gets big old holes in it and pops. So it was clear at that time that this whole thing had froze up, and the extent of the damage could not even be, you know, detailed at that point- until we would have turned the water on and got everything up. Which was not going to happen because there was so much explosion in there.

(*Id*. at 45). Cronkelton immediately contacted Shivley, and "[a]t that time he told me that can't be possible, or if it is I'm upset because I hired Strayer Company to winterization [sic] this property. And you know what, they were supposed to do their job and so forth." (*Id*. at 48). Cronkelton then contacted Keith Strayer, the owner of Strayer Company, who came to inspect the damage. (*Id*. at 49). Cronkelton testified that this was the first time he received a memorandum that

Strayer had sent informing Shivley that the company was unable to properly winterize the building. (*Id*. at 49-50).

{¶14} Strayer testified that his company was unable to properly winterize the building because it was not designed or plumbed to be winterized. Strayer further testified that his company sent Guaranteed Asset Management a memorandum to that effect on December 10, 2009. (*Id*. at 197-199); (Plaintiff's Ex. 5). The memorandum stated:

> I believe we did everything we could to winterize the building but I can not [sic] guarantee there will not be problems when the building is put back into service. The simple fact of the matter is this building was not designed or plumbed to be winterized. The only way to ensure you won't have any problems would be to disconnect and remove all the equipment or install an electric heater to maintain an above freezing temperature.

(Plaintiff's Ex. 5).

{¶15} Shivley testified that he did not give Cronkelton the memorandum from Strayer. (*Id*. at 145). According to Shivley, he made an inspection of the property after November 28, 2009. (*Id*. at 147). At that time, Huntington Bank decided not to pay for the improvements to the property and not to maintain the property because it would not generate any income, "and they elected [to]

basically keep it closed and move forward the way we did." (*Id*.). On December 1, 2009, Shivley submitted an analysis and evaluation of the car wash to Huntington Bank where he stated, "[i]n the current condition of [the] Car Wash and Real Estate, if nothing would be done except turning of [sic] water and utilities, the Car Wash and pipes would burst through the winter and the value of the Car Wash/Real Estate would be for land value only less cost to dispose of Car Wash." (*Id*. at 158); (Plaintiff's Ex. 6). Shivley admitted he sent the email to Cronkelton representing that they would put antifreeze in the water lines, secure the floor heating, blow the water out of all the lines, and keep the heat at a minimal level, and that they would complete the work by December 9, 2009. (*Id*. at 149-150). In a memorandum to Huntington Bank dated March 29, 2010, Shivley wrote, "for the wash in question, on 11/28/09, we did go in and winterize the wash. It was evident that it was too late and that much damage, freezing of pipes, as well as Vandalism had occurred." (*Id*. at 163-164); (Plaintiff's Ex. 11). Shivley repeatedly testified that he did not believe he had any obligation to inform Cronkelton of the problems with the winterization, "[a]s a receiver, I'm not obligated to inform any defects. That's- that's what it is, an as is purchase contract," and "He had- as is, again, it's open for him to do his due diligence. It's not obligated for me to tell him the condition of the property." (Oct. 25, 2011 Tr. at 174, 185).

{¶16} We agree with the trial court that the evidence regarding Shivley's representations was admissible in this case. Here, the representations were consistent with the written agreement and thus not barred by the parol evidence rule when admitted to prove fraudulent inducement. *Galmish*, 90 Ohio St.3d at 28. The evidence demonstrates that Cronkelton intended to purchase the car wash in the condition he observed in November 2009. (Oct. 25, 2011 Tr. at 40-41). Cronkelton was aware that he would have to repair some of the equipment, and thus was purchasing the property "as is." (*Id*. at 34-35). However, Cronkelton also believed that Shivley, as the receiver, would prevent further damage to the property by appropriately winterizing it. (*Id*. at 79-80). Shivley's representations to Cronkelton that he had winterized the property and that it was in the same condition as when Cronkelton inspected it in November 2009 were consistent with Cronkelton's interpretation of the contract, as well as the plain language of the purchase agreement, which simply stated that he was purchasing the property "as is." (Defendant's Ex. 1). Thus, the evidence regarding Shivley's representations was not contrary to the language of the contract. Cronkelton knew that some of the equipment was functioning and some was not, but believed that Shivley, as the receiver, would properly winterize the property to prevent further damage based on the representations he had made.

**{¶17}** Furthermore, the present case is similar to the Supreme Court of Ohio's decision in *Galmish*. In that case, the Court stated, "'[t]he rule excluding parol evidence of collateral promises to vary a written contract does not apply where such contract is induced by promises fraudulently made, with no * * * intention of keeping them * * *.'" In *Galmish*, the plaintiff sold property to the defendant, who represented that he would then sell the property to a developer and pay the plaintiff one half of the proceeds, as long as he sold the property within one year. *Galmish* at 23. The plaintiff alleged that the defendant intentionally delayed completing the sale of the property to prevent paying her a share of the proceeds, and that the defendant never intended to fulfill the promise that induced her to enter into the contract. *Id*. The Supreme Court of Ohio held that evidence of the defendant's promise to the plaintiff was admissible to prove the plaintiff's claim of fraudulent inducement, stating:

> [i]t was never intended that the parol evidence rule could be used as a shield to prevent the proof of fraud, or that a person could arrange to have an agreement which was obtained by him through fraud exercised upon the other contracting party reduced to writing and formally executed, and thereby depriving the courts of the power to prevent him from reaping the benefits of his deception or chicanery.

*Id.* at 28, quoting 37 American Jurisprudence 2d, Fraud and Deceit, Section 451, at 621-622 (1968). The Court thus determined that the evidence of the defendant's representations did not contradict the contract, were admissible to show the circumstances surrounding the finalized written agreement, and were admissible to demonstrate that the defendant never intended to fulfill the promise he made to induce the plaintiff to enter into the contract. *Galmish* at 31.

{¶18} Similarly, in the present case, Shivley made representations to Cronkelton that he never intended to keep. Those representations were made to induce Cronkelton to purchase the property. Specifically, the evidence demonstrates that Strayer sent Guaranteed Construction a memorandum notifying the company that Strayer had been unable to fully winterize the property and that Guaranteed Construction needed to keep the heat on at a minimal level to prevent damage. (Oct. 25, 2011 Tr. at 197-199). Strayer sent this memorandum to Shivley before Cronkelton made his second and third offers on the property, offers made at Shivley's request. (*Id.* at 40-42). Thus, Shivley had been notified that he needed to heat the property to prevent damage at the time that he represented to Cronkelton that the car wash had been fully winterized in accordance with the email he sent Cronkelton in December 2009. (*Id.* at 197-199); (Plaintiff's Ex. 3). Furthermore, the evidence demonstrated that at the time Cronkelton made his offers, Shivley knew Huntington Bank had elected to shut off the utilities because

-14-

the property was not generating income. (Oct. 25, 2011 Tr. at 147). Shivley did not intend to have Guaranteed Asset heat the property because of substantial unpaid balances on prior heating bills that he viewed as Huntington Bank's responsibility. (*Id*.). In March 2010, before Cronkelton signed the purchase agreement in June 2010, Shivley sent a report to Huntington Bank informing them of damage to the property, comprising of damage that was the result of freezing. (*Id*. at 163-164). However, Shivley consistently represented to Cronkelton that the property had been appropriately winterized, including maintaining the heat at a minimal level, although he had no intention of heating the property and knew the car wash had been damaged from freezing. As in *Galmish*, this evidence was admissible to show the circumstances surrounding the finalized written agreement, to demonstrate that Shivley never intended to fulfill the promises he made to Cronkelton, and to prove Shivley induced Cronkelton to enter into the contract.

{¶19} The dissent argues that admitting this evidence disregards the parol evidence rule. We disagree. Rather, the evidence is admissible as an exception to the parol evidence rule in the case of fraudulent inducement because the representations are consistent with the contract's language. *Galmish*, 90 Ohio St.3d at 28. Given the circumstances of this case, the trial court did not err by admitting Shivley's representations to prove Cronkelton's claim of fraudulent inducement.

{¶20} Appellants' first assignment of error is, therefore, overruled.

**Assignment of Error No. II**

**As a matter of law, appellee's reliance on Mr. Shivley's statements about the condition of the car wash was not justified**

{¶21} In their second assignment of error, appellants argue Cronkelton unjustifiably relied on Shivley's statements about the car wash's condition because Cronkelton had the opportunity to inspect the property prior to closing.

{¶22} The doctrine of caveat emptor places a duty on the buyer of real estate to make an inquiry or investigation into a property's potential defects. *Findlay Ford Lincoln-Mercury v. Huffman*, 3d Dist. No. 5-02-67, 2004-Ohio-541, ¶ 14. A seller is not obligated to disclose everything he or she knows about the property to the buyer. *Id*. However, caveat emptor "has never shielded deliberate fraud by the seller." *Id*. In order for the doctrine of caveat emptor to apply, "(1) the defect must be open to observation or discoverable on reasonable inspection, (2) the purchaser must have an unimpeded opportunity to examine the property, and (3) the vendor may not engage in fraud." *Id*. ¶ 15, citing *Boehringer v. Miller*, 3d Dist. No. 2-88-18 (Jan. 29, 1990).

{¶23} As an initial matter, we note that appellants argue whether Cronkelton justifiably relied on Shivley's representations is a question of law. However, this Court has previously stated that "[w]hether or not reliance on a material misrepresentation was justified under the facts of a case is a question for

the trier of fact." *Simon Property Group v. Kill*, 3d Dist. No. 1-09-30, 2010-Ohio-1492, ¶ 26. Consequently, we must determine whether the jury's decision is supported by competent, credible evidence. *Id*. at ¶ 31.

**{¶24}** In the present case, it is undisputed that the damage caused by freezing was open and obvious upon inspection, that Cronkelton did inspect the property in November 2009, and that he could have inspected the property again before signing the purchase agreement. Cronkelton testified regarding why he did not inspect the property after November 2009:

> Because I was guaranteed by- by- in writing and several conversations that everything- the only thing I was worried about was it not freezing. I wasn't worried about the state of the equipment, whether it was repairable because I had already looked at that and made my assessment on that. I was just mainly concerned about the freezing. Wrote me this e-mail, guaranteed me it was taken care of in detail what he was going to do, so I had no reason. And because I relied on him being professional, he's got a real estate license, he was appointed by the Court, I don't know how much more I could have done to know that I could trust him.

(Oct. 25, 2011 Tr. at 79-80). In response to an interrogatory, the jury found that Cronkelton had reasonably relied on Shivley's representations. (Doc. No. 73).

{¶25} The jury's finding was supported by competent, credible evidence. This Court has previously stated that when determining whether reliance is justifiable:

> courts consider the various circumstances involved, such as the nature of the transaction, the form and materiality of the transaction, the form and materiality of the representation, the relationship of the parties, the respective intelligence, experience, age, and mental and physical condition of the parties, and their respective knowledge and means of knowledge.

*Findlay Ford*, 2004-Ohio-541 at ¶ 22.

{¶26} Cronkelton relied on representations made by Shivley, who was a receiver. (Oct. 25, 2011 Tr. at 79-80). Shivley was appointed as a receiver pursuant to R.C. 2735.01 and had taken an oath to faithfully discharge his duties and obey the trial court's orders. R.C. 2735.03. As a receiver, Shivley had a fiduciary duty to the assets under his control. *Hummer v. Hummer*, 3d Dist. No. 96132, 2011-Ohio-3767, ¶ 18. Under the circumstances of this case, Cronkelton had a reasonable basis to believe that Shivley, who was acting as an arm of the court, would take the promised steps to winterize the property.

{¶27} Appellants cite several cases where this Court has previously held that the doctrine of caveat emptor barred a party from recovering damages for

undisclosed defects. *See Van Horn v. Peoples Banking Co.*, 64 Ohio App.3d 745 (3d Dist.1990); *Findlay Ford*, 2004-Ohio-541. However, those cases are distinguishable from the instant case. In each of those cases, the plaintiff failed to take affirmative actions to discover the defect. *Id.*; *Id.* Furthermore, although the plaintiffs in those cases alleged the defendants had made misrepresentations, the misrepresentations did not rise to the level of fraud. *Id.*; *Id.* In the case currently before this Court, Cronkelton did take affirmative steps to discover the defect by inspecting the property in November 2009 and repeatedly confirming with Shivley that Shivley had taken the steps necessary to winterize the property. (Oct. 25, 2011 Tr. at 33-36, 40-43). In addition, Shivley's misrepresentations that he had taken the appropriate steps to winterize the property rose to the level of fraud because his statements were: (1) actual misrepresentations, (2) made while knowing their falsity, (3) with the intent to mislead, (4) justifiably relied upon by Cronkelton, and (5) caused damage to Cronkelton. *Findlay Ford* at ¶ 20. Therefore, Cronkelton's fraud claim is not barred by the doctrine of caveat emptor.

{¶28} Appellants' second assignment of error is, therefore, overruled.

### Assignment of Error No. III

**The additional egregious conduct necessary to justify an award of punitive damages and attorney's fees is not present in this case.**

{¶29} In their final assignment of error, appellants argue the trial court erred by awarding Cronkelton punitive damages and attorney fees because Cronkelton failed to demonstrate that the fraud was aggravated by malice or that the wrongdoing was especially egregious.

{¶30} "Punitive damages are awarded to punish the guilty party and deter tortious conduct by others." *Digital & Analog Design Corp. v. North Supply Co.*, 63 Ohio St.3d 657, 664 (1992). However, punitive damages are not appropriate in every case of fraud. *S.H.Y., Inc. v. D. Garman*, 3d Dist. No. 14-04-04, 2004-Ohio-7040, ¶ 43. "In cases alleging fraud, in order to be awarded punitive damages, the plaintiff must establish not only the elements of the tort itself, but must also show that either the fraud is aggravated by the existence of malice or ill will or must demonstrate that the wrongdoing is particularly gross or egregious." *Id*. As a general rule, it is reasonable to award attorney fees in an action where punitive damages have been awarded, although this issue is in the sound discretion of the trial court. *Digital & Analog* at 664, citing *Columbus Finance, Inc. v. Howard*, 42 Ohio St.2d 178, 183 (1975). "The trial judge is in the best position to determine whether an award is so excessive as to be deemed a product of passion or prejudice, and the trial court's determination on that issue will not be disturbed absent an abuse of discretion." *Burns v. Prudential Securities*, 3d Dist. No. 9-03-

49, 2006-Ohio-3550, ¶ 78, citing *Fromson & Davis Co. v. Reider*, 127 Ohio St. 564, 569 (1934).

**{¶31}** We cannot find that the jury abused its discretion by awarding punitive damages in this case. The evidence presented at trial demonstrates that not only was Shivley dishonest with Cronkelton, but that he was dishonest with the court. Shivley's actions were particularly egregious in light of his role as a receiver, who was appointed by the court and had a duty to faithfully fulfill his responsibilities. Shivley received the memorandum indicating Strayer had been unable to fully winterize the property on December 10, 2009, and forwarded the memorandum to Huntington Bank by email. (Oct. 25, 2011 Tr. at 152-154). However, in his deposition in this case, Shivley claimed he had not previously seen the memorandum. (*Id*. at 152). In his November 28, 2009 report, Shivley stated that the property's utilities were still turned on. (*Id*. at 172). However, in an affidavit filed with the trial court, Shivley averred that "at the time Guaranteed took control of the subject premises, the water and electricity had been shut off and, therefore, Guaranteed never tested or inspected the equipment at the property." (Doc. No. 22); (Plaintiff's Ex. 21). Shivley also averred that neither he nor any of his employees had any actual knowledge as to the condition of the equipment on the premises, although in a March 29, 2010 letter, he stated "we did go in and winterize the wash. It was evident that it was too late and that much

damage, freezing of pipes as well and vandalism had occurred." (Oct. 25, 2011 Tr. at 163-164). Shivley also filed a report with the court stating, "we did winterize the facility with a professional plumber and did general maintenance to the facility back in November." (*Id*. at 182). This evidence shows that Shivley continually represented to the trial court that he was fulfilling his responsibility as a receiver and was unaware of the damage to the premises, although the Strayer memorandum and report to Huntington Bank demonstrate that Shivley knew the car wash had not been properly winterized and was damaged from freezing. In light of the foregoing, we cannot find that the jury abused its discretion by determining Shivley's conduct was particularly egregious. Since the punitive damages were appropriate in this case, the trial court also did not err by awarding attorney fees.

{¶32} Appellants' third assignment of error is, therefore, overruled.

{¶33} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI, J., concurs.**

**/jlr**

**ROGERS J., Dissenting.**

{¶34} I must respectfully dissent from the majority's opinion. I would first find that the parol evidence rule would exclude the admission of Shivley's pre-contract representations, and further, that even if permitted, Cronkelton could not claim justifiable reliance on such representations.

{¶35} I first disagree with the majority's disregard of the parol evidence rule. The application of the parol evidence rule was aptly set forth in *Busler v. D & H Mfg., Inc.*, 81 Ohio App.3d 385 (10th Dist. 1992). The court of appeals explained:

> This misnamed and often misunderstood rule is not really a rule of evidence but instead is a rule of substantive law designed to protect the integrity of final, written agreements. *Charles A. Burton, Inc. v. Durkee* (1952), 158 Ohio St. 313, paragraph one of the syllabus. *If contracting parties integrate their negotiations and promises into an unambiguous, final, written agreement, then evidence of prior or contemporaneous negotiations, understandings, promises, representations, or the like pertaining to the terms of the final agreement are generally excluded from consideration by the court.* *Id.* at paragraph two of the syllabus; *Yoder v. Columbus & S. Elec. Co.* (1974), 39 Ohio App.2d 113. This rule is not confined to excluding merely parol communications; it excludes contrary written communications as well.
>
> Notwithstanding, many Ohio cases have held that a party may offer evidence of prior or contemporaneous representations to prove fraud in the execution or inducement of an agreement. See, *e.g., Stegawski v. Cleveland Anesthesia Group, Inc.* (1987), 37 Ohio App.3d 78, 84. Indeed, without such evidence it would be difficult if not impossible to prove fraud. However, it is important to realize that the law has not allowed parties to prove fraud by claiming that the inducement to enter into an agreement was a promise within the

scope of the integrated agreement but which was not ultimately included in it. *Id.* at 84; *AmeriTrust Co. v. Murray* (1984), 20 Ohio App.3d 333, 335. Hence, if there is a binding and integrated agreement, then evidence of prior or contemporaneous representations is not admissible to contradict the unambiguous, express terms of the writing. Restatement, *supra,* at 136, Section 215. (Emphasis added.) *Busler* at 390-391. *Accord Paragon Networks Intl. v. Macola, Inc.*, 3d Dist. No. 9-99-2 (April 28, 1999).

**{¶36}** Here the purchase agreement, prepared by Cronkelton, stated that the property was being purchased "in its 'as is' condition without any representations and warranties from Seller regarding the condition of the Real Property." (Defendant's Exhibit 1, p. 1). Any representations by Shivley as to the winterization of the property were within the scope of the integrated agreement but not ultimately included in it. Therefore, the parol evidence rule requires that evidence of prior representations to the contrary be excluded.

**{¶37}** In addition, I would also find that, as a matter of law, Cronkelton could not claim justifiable reliance upon any of Shivley's representations concerning winterization of the property. The majority places much weight on the fact that Cronkelton inspected the property in late November 2009 when he made his first offer on the property. This then becomes the basis which they argue justified his later reliance on Shivley's representations. However, Cronkelton revoked that offer. A second verbal offer was made and refused. Finally, in March 2010, a third offer was made and accepted, resulting in the purchase agreement at issue in this matter.

{¶38} What the majority fails to discuss is that the final written purchase agreement was drafted by Cronkelton. In the agreement, Cronkelton, as discussed above, acknowledged that he was purchasing the property "in its 'as is' condition without any representations and warranties from Seller regarding the condition of the Real Property." (Defendant's Exhibit 1, p. 1). In addition, Cronkelton gave himself an unlimited right to inspect the property, a right he failed to exercise immediately before entering the purchase agreement.

{¶39} Apparently the majority is convinced that Cronkelton's inspection of the property in November 2009, coupled with Shively's representations concerning the property's winterization, relieved Cronkelton of any obligation of due diligence or actual inspection. I strongly disagree.

{¶40} First, Cronkelton's inspection in November 2009 was in conjunction with an offer that he withdrew. It is therefore irrelevant to the purchase agreement at issue in this matter.

{¶41} Second, the November inspection was too remote in time to be relied upon and occurred prior to the time period and weather conditions that were the subject of Cronkelton's concerns. It is therefore immaterial to the purchase agreement at issue in this matter.

{¶42} Third, Cronkelton failed to take advantage of his right to inspect the property which he had included in the purchase agreement that he drafted.

Cronkelton claims that his only concern when making a new offer on the property was whether the property had survived the winter months in substantially the same condition as it was in when he inspected it in November 2009. If that was the case, then a cursory inspection by Cronkelton would have removed any question of the property's condition. In fact, his testimony suggests that after the closing all he had to do was open the door to enter the property and the damage was obvious.

{¶43} At most, Shivley's representations may have induced a new offer from Cronkelton. I fail to see any justification for allowing Cronkelton to claim he was induced to purchase the subject property by Shivley's representations when he had the right, the opportunity, and the duty to inspect the property within a reasonable time before entering into the purchase agreement.

{¶44} Again, the purchase agreement, prepared by Cronkelton, unequivocally stated that the property was being purchased in "as is" condition. Any representations by Shivley as to the winterization of the property were within the scope of the integrated agreement but not ultimately included in it. The representations were not even as to the condition of the property, but rather as to the winterization of the property. Even if winterization had been accomplished, common sense tells one that events may have occurred to cause damage not present when an inspection took place four months earlier. Under these

circumstances Cronkelton should be estopped from asserting that his reliance on Shivley's representations was reasonable.

**{¶45}** Finally, the majority argues that an exception to the parole evidence rule applies in this case because the representations were consistent with the contract's language.  I fail to see any consistency between representations of winterization and acceptance of the property in its "as is" condition.

**{¶46}** For all the reasons stated above, I dissent from the majority's opinion and would reverse the judgment of the trial court.

/jlr