[Cite as *Kraft Elec. Contracting, Inc. v. Lori A. Daniels Irrevocable Trust Dated January 15, 2001*, 2019-Ohio-2029.]

# IN THE COURT OF APPEALS

# FIRST APPELLATE DISTRICT OF OHIO

# HAMILTON COUNTY, OHIO

KRAFT ELECTRICAL CONTRACTING, INC.,

HICON, INC.,

CENTRAL INSULATION SYSTEMS, INC.,

LAFORCE, INC.,

MBJ CONSULTANTS, INC.,

MIRAGE CAULKING, INC.,

THE MARK MADISON COMPANY,

TEPE ENVIRONMENTAL SERVICES, LTD.,

UNIVERSAL CLEANING, LLC,

SECURITY FENCE GROUP, INC.,

THE PAINTING CONTRACTOR, LLC,

KELLEY BROS. ROOFING, INC.,

SPOHN ASSOCIATES, INC.,

TRIUMPH SIGNS AND CONSULTING, INC.,

   and

JARVIS MECHANICAL CONSRUCTORS, INC.,

   Plaintiffs-Appellees,

   vs.

LORI A. DANIELS IRREVOCABLE

APPEAL NO. C-180361
TRIAL NO. A-1605462

*O P I N I O N.*

TRUST DATED JANUARY 15, 2001,  :

LORI A. DANIELS in her capacity as  :
cotrustee of the  LORI A. DANIELS
IRREVOCABLE TRUST,  :

    and  :

PATRICK MCCLUSKEY  in his capacity  :
as cotrustee of the  LORI A. DANIELS
IRREVOCABLE TRUST,  :

    Defendants-Appellants.  :

Civil Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  May 24, 2019

*Benjamin, Heather, Iaciofan0 & Bitter, LLC,* and *Patrick M. O'Neill,* and *Yocum & Nueroth, LLC,* and *Thomas R. Yocum,* for Plaintiffs-Appellees,

*Christopher Weist,* for Defendants-Appellants.

**BERGERON, Judge.**

{¶1}   This is the latest chapter in the saga of the Kenwood Towne Center debacle that has generated several opinions from this court.  In this installment, we deal with parties who reached a settlement, amended that settlement, and now cannot agree whether the first payment received constitutes the "initial payment" under the agreement.  Although it may seem counterintuitive, we agree with the trial court that the initial payment here really was not the "initial payment," and we accordingly affirm its judgment and damages decision.

I.

{¶2}   This case began innocently enough with a payment dispute arising roughly a decade ago.  Plaintiffs-appellees are comprised of approximately 15 different subcontractors (globally referred to as the "Kraft Group") that were owed money by Matt Daniels and various associated entities (the "Daniels Parties").  After a long and tortured history that we will skip over in the interests of brevity, the Kraft Group entered into a settlement agreement with the Daniels Parties in 2013.  The settlement agreement, in broad strokes, provided that the Daniels Parties would pay  up to $625,000 to the Kraft Group in order to resolve the pending litigation between the parties.

{¶3}   But the Daniels Parties did not live up to their obligations under the settlement agreement, which precipitated a renegotiation in 2014.  The parties executed another settlement agreement at that time, which provided that the Daniels Parties agreed to pay $661,986.40 in full by December 31, 2014.  As part of this settlement agreement, the Daniels Parties also agreed to a consent judgment of $2,000,000, which the Kraft Group could enforce if they did not timely pay in full.

{¶4}   Yet again, the Daniels Parties breached.  Perhaps hoping that the third time would be the charm, the Kraft Group eventually agreed to the terms of a "Settlement

Amendment" in 2016. That amendment lies at the heart of the dispute before us. The Settlement Amendment includes several provisions that reflect the Kraft Group's exasperation at years of continued nonpayment for their work and efforts by the Daniels Parties to evade their obligations.

{¶5} Key new components of the Settlement Amendment were the inclusion of both the "Good Faith Payment" and the "Initial Payment." These payments were also separately guaranteed by the Lori A. Daniels Irrevocable Trust Dated January 15, 2001 ("Trust") via the inclusion of an unconditional guaranty in the Settlement Amendment. Moreover, the Settlement Amendment now obligated the Daniels Parties to pay $800,000 (although that amount could be reduced somewhat if certain conditions came to pass).

{¶6} The Good Faith Payment constituted a $10,000 payment to be made out of the sale proceeds of certain parcels of land as delineated in the Settlement Amendment. Relatedly, the Initial Payment required that "[o]n or before April 13, 2016, the Daniels Parties shall pay * * * an initial payment in the amount of One Hundred Thousand and 00/100 Dollars * * * ("Initial Payment")." The parties further provided that if the Daniels Parties did not timely satisfy the Initial Payment obligation, they would incur $10,000 in charges for each month that the Initial Payment remained outstanding.

{¶7} From these terms of the Settlement Amendment the current dispute now arises. The parties both agree the Daniels Parties timely paid the Good Faith Payment. The parties also acknowledge that another payment was made by the Daniels Parties to the Kraft Group in the amount of $178,651 in March of 2016. This payment derived from the sale of certain land held by BCC Bowling Green LLC, one of the companies comprising the Daniels Parties. The disagreement between the parties boils down to how this $178,561 payment should be credited to the settlement amount owed by the Daniels Parties under the terms of the Settlement Amendment.

4

{¶8} The impetus of the Kraft Group's claim was that, while the $178,651 payment was credited to the overall settlement amount ($800,000 in total) owed by the Daniels Parties, this was not the payment contemplated to satisfy the Initial Payment. As a result, not only in their eyes did this amount begin to accrue the $10,000 monthly charges, but it also entitled the Kraft Group to sue per the terms of the Settlement Amendment and enforce the unconditional guaranty against the Trust.

{¶9} The matter ultimately proceeded to a bench trial, at which the Kraft Group advanced various reasons for why the $178,651 did not satisfy the Initial Payment, including the Daniels Parties' failure to designate the payment as such on the check, the consideration that the Initial Payment was meant to be from a new source of funds (not already secured funds that the $178,651 payment represented), and various communications between the parties that essentially confirmed as much. For its part, the Trust countered that the Settlement Amendment was unambiguous and "initial" in this instance meant "first" and as such the $178,651 payment, being the first payment made (and exceeding $100,000), thus satisfied the Initial Payment. They also insisted that the emails between the parties constituted impermissible parol evidence and that the $10,000 monthly charge ran afoul of Ohio law proscribing penalty provisions.

{¶10} The trial court ultimately found the Daniel Parties in breach of the Settlement Amendment and entered judgment in the Kraft Group's favor in the amount of $320,000. From this decision the Trust now appeals, presenting five assignments of error that essentially frame two main issues: (1) how the $178,651 payment was to be applied, and (2) challenging the $320,000 damages award as incorrectly calculated and involving an impermissible penalty. We will address the assignments of error under these umbrellas.

II.

A.

{¶11}  The Trust's first and fourth assignments of error challenge the finding that the $178,651 was not the Initial Payment and the admittance of emails between counsel for the Trust and Kraft Group, respectively. The Trust does its best to frame this as a pedestrian contractual squabble, which it wins (in its view) because the meaning of "initial" under the Settlement Amendment is synonymous with "first."  While its plain-language argument has some intuitive appeal, it fails to account for the broader context of how the parties implemented the agreement.  The issue is not just what the relevant language means, but rather, whether the parties intended that this particular payment (that differed from the $100,000 described in the agreement) be treated as the "Initial Payment."

{¶12}  And the plain language of the Settlement Amendment alone does not provide us the answer here.  The payment in question was for a different amount and paid on a different date than those used in the definition of "Initial Payment," and the Daniels Parties did not denominate it as such either on the check or in any conveyance correspondence. This incongruity with the definition of "Initial Payment" yields sufficient ambiguity that it compels us to "consider the parties' course of performance in determining their intent." *See Cincinnati Ins. Co. v. ACE INA Holdings, Inc.*, 175 Ohio App.3d 266, 2007-Ohio-5576, 886 N.E.2d 876, (1st Dist.) ¶ 33 (finding that the parties' course of performance revealed that use of "aggregate" meant that amount at issue was to accrue annually).  Upon surveying the course-of-performance evidence, it seems to us largely uncontested.

{¶13}  Notably, at trial, the only witness who testified was counsel for the Kraft Group—the Trust elected not to produce any witnesses.  This decision assumed significance in light of the series of emails between the parties' counsel that confirmed that the $178,651

was not the Initial Payment. Given that the Trust elected not to try to blunt the force of these emails either through testimony or contradictory exhibits, their appeal largely rises and falls on the determination of whether the emails constitute parol evidence. On appeal we review this issue de novo. *Cronkelton v. Guaranteed Constr. Servs.*, 2013-Ohio-328, 988 N.E.2d 656, ¶ 11 (3d Dist.) ("The application of the parol evidence rule is an issue of substantive law that is reviewed de novo on appeal.").

{¶14} The emails capture a series of communications between Jason Kuhlman, counsel for the Trust, and Julia Neuroth, counsel for the Kraft Group. These emails reveal acknowledgments by Mr. Kuhlman that the Initial Payment was not made as anticipated by the parties. One email, dated in April 2016, included a carefully-diagramed spreadsheet allocating the $178,561 payment to the overall settlement amount, but explains that "[a]fter the payment of the $100K and the elimination of all consequences that attend to the nonpayment of that sum, then the 12/31 number in that spreadsheet I will create thereafter will actually be the payoff." In other words, Mr. Kuhlman tacitly acknowledged that the Initial Payment had not been made.

{¶15} That tacit acknowledgment soon became explicit. In another email from June 2016, Ms. Neuroth wrote "[j]ust as a reminder (not that you need it), but next Wednesday is the 15th and an additional $10K will be due." Mr. Kuhlman responded "I am aware of the deadline, of course, but thanks." Finally, a few days later, Mr. Kuhlman writes "I spoke with Matt [Daniels] yesterday, and that other sale I've mentioned from which the $110K was going to be paid has not fully distributed yet. We're looking at another 2-4 weeks * * * Matt is aware that the payment at that time will then be $120K." Translating the last email, it conveyed that Mr. Daniels understood that the Daniels Parties would owe $120,000 because they defaulted on the $100,000 Initial Payment, and two months had elapsed (hence an additional $20,000).

7

{¶16} Not surprisingly, the Trust tried to suppress this evidence, claiming that it violated the parol evidence rule. But this stems from a misunderstanding of the parol evidence rule, which endeavors to preserve the integrity of written agreements by prohibiting modification with evidence of prior or contemporaneous writings. *See Bellman v. Am. Internatl. Group*, 113 Ohio St.3d 323, 2007-Ohio-2071, 865 N.E.2d 853. ¶ 7 (prior or contemporaneous agreements cannot be used to modify a writing meant to be the final agreement between parties); *Stratman v. Atkinson*, 40 Ohio App.2d 337, 340, 319 N.E.2d 372 (1st Dist.1978) (same). It has little, if any, application to communications *subsequent* to the written agreement. *See Paulus v. Beck Energy Corp.*, 2017-Ohio-5716, 94 N.E.3d 73, ¶ 41 (7th Dist.) (parol evidence rule does not apply to subsequent modifications of a written agreement). Indeed, communications between the parties after the agreement's execution often constitute valuable evidence as to how both parties understood and implemented the agreement: "If the words used in a contract are susceptible to more than one meaning, and the signatories in carrying out the contract have by subsequent acts placed their own interpretation on the meaning of the words, courts may adopt the interpretation that the signatories to the contract have themselves made." *Cincinnati Ins. Co.*, 175 Ohio App.3d 266, 2007-Ohio-5576, 886 N.E.2d 876, at ¶ 33; *see Fox Consulting v. Spartan Warehouse & Distrib., Inc.,* 2016-Ohio-7621, 73 N.E.3d 1055, ¶ 16 (1st Dist.) (court considered email correspondence subsequent to the contract between the parties to resolve payment dispute regarding future amounts owed under contract in accord and satisfaction context).

{¶17} And the emails here do not purport to modify the Settlement Amendment or otherwise vary its terms. To the contrary, they simply reflect the consensus between the parties that the Initial Payment had not been made. Of course, if the Trust had contradictory evidence at its disposal, it was at liberty to use it. The absence of such evidence suggests a litigation-driven change of heart.

{¶18} We see no error in the trial court's consideration of the email correspondence, which means that competent, credible evidence supported the trial court's decision. Beyond the email correspondence, the testimony of the sole witness presented at trial ratified the Kraft Group's understanding as well. Thomas Yocum, counsel for the Kraft Group, testified that the $100,000 was to be "fresh money on the barrel," explaining the Kraft Group's wariness in light of the two prior failures by the Daniels Parties to adhere to settlement agreements, so they demanded "to see cash now." Mr. Yocum's testimony tends to corroborate what the emails conveyed—that neither party contemplated the $178,651 payment as satisfaction for the Initial Payment.

{¶19} In light of foregoing, we see no error in the trial court's conclusion that the $178,561 did not satisfy the Initial Payment. Evidence in the record substantiated that the parties understood that the $100,000 remained outstanding. Furthermore, coupled with the dearth of any competing evidence from the Trust to contradict this, we cannot say that the trial court's findings were against the manifest weight of the evidence. We accordingly overrule the first and fourth assignments of error.

**B.**

{¶20} The Trust's remaining three assignments of error revolve around the $320,000 damages award. The Trust's main challenge decries the $10,000 monthly charge as an unenforceable penalty, a point which we review de novo. *Boone Coleman Constr., Inc. v. Piketon*, 145 Ohio St.3d 450, 2016-Ohio-628, 50 N.E.3d 502, ¶ 10.

{¶21} Though parties are generally free to contract for agreed-upon damages, such damages which amount to a penalty rather than valid liquidated damages are prohibited as a matter of public policy. "Because the sole purpose of contract damages is to compensate the nonbreaching party for losses suffered as a result of a breach, '[p]punitive damages are

not recoverable for a breach of contract' " unless tortious conduct produced the breach. *Lake Ridge Academy v. Carney*, 66 Ohio St.3d 376, 381, 613 N.E.2d 183 (1993), quoting 3 Restatement of the Law 2d, Contracts, Section 355, at 154 (1981).

{¶22} Agreed-to damages constitute valid liquidated damages rather than unenforceable penalties when the damages are:

> (1) uncertain as to amount and difficult to proof, and if (2) the contract as a whole is not so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the true intentions of the parties, and if (3) the contract is consistent with the conclusion that it was the intention of the parties that the damages in the amount stated should follow the breach thereof.

*Drake Townhomes, LLC v. Woodberry*, 1st Dist. Hamilton No. C-160632, 2017-Ohio-6968, ¶ 22, quoting *Sampson Sales, Inc. v. Honeywell, Inc.*, 12 Ohio St.3d 27, 29, 465 N.E.2d 392 (1984).

{¶23} Further overlaying this analysis is that, in reviewing these damages, the court "must step back and examine [the damages provision] in light of what the parties knew at the time the contract was formed and in light of an estimate of the actual damages caused by the breach." *Carney* at 188. With an understanding of all the surrounding circumstances and this analytical framework as our backdrop, we cannot say that the damages provision here constitutes an unenforceable penalty, largely for two reasons.

{¶24} First, the Trust waived its contractual defenses in the Settlement Amendment. The amendment provides: "[T]he Trust agrees not [to] assert any defenses and hereby waives any and all defenses[.]" While the Trust now seeks to run away from what it signed, fashioning public policy arguments, we see no reason to excuse it from a predicament of its

own making. This was not some type of adhesive contract—both parties were sophisticated entities, represented by counsel, and negotiating at arms-length. Under such circumstances, courts will enforce waivers of defenses like the Trust's. *See U.S. Bank Natl. Assn. v. Green Meadows SWS L.L.C.*, 2014-Ohio-738, 9 N.E.3d 433, ¶ 31 (5th Dist.) ("A party can waive its potential legal defenses against enforcement of a guaranty as a term within the guaranty."); *see Buckeye Fed. S. & L. Assn. v. Guirlinger*, 62 Ohio St.3d 312, 316, 581 N.E.2d 1352 (1991) (finding that a party expressly waived the claimed defense as part of a guarantee agreement).

{¶25} Second, even if we declined to enforce the waiver, the Trust's claim would not prevail on the merits. As the party seeking to invalidate the liquidated damages provision, the Trust bore the burden of proof to establish the $10,000 monthly charge constituted an impermissible penalty rather than valid liquidated damages. *See CosmetiCredit, L.L.C. v. World Fin. Network Natl. Bank,* 2014-Ohio-5301, 24 N.E.3d 762, ¶ 48 (10th Dist.) ("A party seeking to invalidate a purported liquidated-damages clause is asserting an affirmative defense and bears the burden of proof establishing that the clause generates damages in the form of a penalty * * *."). The Trust failed to meet this burden of proof when it declined to introduce any evidence that the $10,000 was an unenforceable contractual penalty, and the trial court acknowledged as much: "Neither party offered any evidence in this regard." The Trust makes no effort to rebut the trial court's conclusion on this point.

{¶26} Additionally, given the history between the parties, we think that the *Drake Townhomes* criteria for evaluating liquidated damages are satisfied. *See Oldendick v. Crocker*, 2016-Ohio-5621, 70 N.E.3d 1033, ¶ 42 (8th Dist.) (whether amounts specified in a contract are valid liquidated damages or an unenforceable penalty turns upon each case's operative facts and circumstances). The Kraft Group has been chasing the Daniels Parties for the better part of a decade, trying (and failing) on multiple occasions to force them to

live up to their contractual commitments. This has entailed whittling down what began as an obligation to pay potentially millions of dollars (or at least the $2,000,000 reflected in the consent judgment) to $800,000, most of which (as best we can tell) has not been paid.

{¶27} The $10,000 per month clause was a product of the Kraft Group's apprehension at entering into yet another deal that they probably suspected would remain unfulfilled. We also think it a fair assumption that if the Daniels Parties could not scrape together the $100,000 Initial Payment, then they would default on some or all of their obligations under the balance of the Settlement Amendment. *See B & G Properties Ltd. Partnership v. Office Max, Inc.*, 2013-Ohio-5255, 3 N.E.3d 774, ¶ 32-33 (8th Dist.) (time spent addressing issues related to the breach was valid consideration for liquidated damages).

{¶28} Fully considering the history between the parties, their sophisticated natures, and the ultimate exposure satisfies us that the $10,000 a month clause does not sound any unconscionability alarms, and that it represents a fair estimate of future damages for breach (at least in the absence of evidence to the contrary). *See Boone Coleman Constr., Inc.*, 145 Ohio St.3d 450, 2016-Ohio-628, 50 N.E.3d 502, at ¶ 35-36 (conscionability and reasonableness of liquidated damages to be determined at the time of contracting rather than at the time of litigation); *Kent State Univ. v. Ford*, 2015-Ohio-41, 26 N.E.3d 868, ¶ 36 (11th Dist.) (no unconscionability when party had consulted with attorney and had negotiated as to the liquidated damages provision). The fact that, with the advantage of hindsight, the Trust now considers the $10,000 charge exorbitant in light of the actual amount accrued under the agreement is immaterial. *Boone Coleman Constr., Inc.* at ¶ 38 ("It is a perverse rule of law to hold that a court can relieve a breaching party of the consequences it agreed to by refusing to enforce a per diem liquidated-damages provision solely because the breach was an egregious one."). Instead, it appears to be a reasoned

choice by the parties for how to deal with the attendant uncertainty of damages from another breach.

{¶29} The Trust cannot negotiate the terms of the agreement one day, acknowledge the charges as a consequence of breach on another, and yet still expect a finding that this charge does not reflect the intentions of the parties when its counterparty submits the bill. For these reasons, the damages provision constituted valid liquidated damages on the record before us.

{¶30} Finally, in further seeking to invalidate the damages award, the Trust argues in its third assignment of error that the $320,000 in damages awarded to the Kraft Group represents an impermissible award of "double damages" for both the $10,000 monthly charge and prejudgment interest. But we are at a loss to understand this argument because the trial court's judgment reflects no award of prejudgment interest. Nor do we see any suggestion in the record that the court intended to award prejudgment interest. Regardless, because prejudgment interest was not imposed, we reject this argument.

{¶31} In sum, we see no error in the trial court's decision, and we accordingly overrule all five of the Trust's assignments of error and affirm the trial court's judgment.

Judgment affirmed.

MOCK, P. J., and ZAYAS, J., concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.