**CINCINNATI INSURANCE COMPANY, Appellant and Cross–Appellee,**

v.

**ACE INA HOLDINGS, INC., Appellee and Cross–Appellant.**

[Cite as *Cincinnati Ins. Co. v. ACE INA Holdings, Inc.*, 175 Ohio App.3d 266, 2007-Ohio-5576.]

Court of Appeals of Ohio,
First District, Hamilton County.

Nos. C–060384 and C–060385.

Decided Oct. 19, 2007.

268

K. Roger Schoeni, Kimberly A. Zamary, and Louis C. Schneider, for appellant and cross-appellee.

McCaslin, Imbus, & McCaslin and Joseph C. Gruber; and Cohn, Baughman & Martin and Patrick Shine, for appellee and cross-appellant.

MARK P. PAINTER, Presiding Judge.

{¶ 1} We address a lost-policy insurance-coverage quarrel. We have to admit struggling with the issues—we even had one issue rebriefed by the parties. After much gnashing of teeth, we affirm. The aggregate policy limits applied annually; and the "deemer" clause was ineffective to limit liability on these facts.

## I. The Parties and the Policies

{¶ 2} An excess insurer, plaintiff-appellant and cross-appellee The Cincinnati Insurance Company ("CIC"), sued the primary insurer, defendant-appellee and cross-appellant ACE INA Holdings (f.k.a. CIGNA Property & Casualty Insurance Company, f.k.a. Aetna Property & Casualty Insurance Company) in a declaratory-judgment action seeking an additional $1,800,000 to cover asbestos claims against their insured, defendant Flexo Products, Inc. (For clarity, we use "ACE" interchangeably with its predecessors, "CIGNA" and "AETNA," throughout this decision.)

{¶ 3} Flexo manufactured and sold protective masks that purportedly filtered and protected against harmful particles like silica. ACE insured Flexo under three different and consecutive primary insurance policies. The three consecutive policies ran from 1963 to 1966 ("Policy 1"), from 1966 to 1969 ("Policy 2"), and from 1969 to 1972 ("Policy 3"). CIC issued excess policies to Flexo from 1967 to 1986.

{¶ 4} Defendant Westfield Insurance Company also provided primary insurance to Flexo but has been dismissed from this case. CIC and ACE provided separate layers of insurance coverage to Flexo. ACE was the primary insurer, and CIC provided an excess layer of coverage. When ACE notified CIC that its primary coverage had been exhausted, this declaratory-judgment action followed.

{¶ 5} CIC alleged that ACE owed an additional $1,800,000 in primary coverage based on three multi-year policies. The three successive multi-year policies each spanned three years, for nine years of total coverage. The policies in the record are incomplete, but the available documents reveal that ACE's potential liability was $300,000 "aggregate." The $1.8–million question was whether the word "aggregate" meant that the $300,000 limit applied *per year* or *per term.*

{¶ 6} The parties do not contest the trial court's decision declaring that the limit of Policy 1 was $900,000. But if the contracting parties contemplated an "annual aggregate," then, under Policies 2 and 3, ACE owed for six years at $300,000 per year, totaling $1,800,000. But if a "term aggregate" was meant, then ACE owed for two terms at $300,000 per term, totaling $600,000. Both parties moved for summary judgment in the trial court.

{¶ 7} CIC argued that the $300,000 applied annually, totaling $1,800,000 in coverage, and that ACE had denied coverage in bad faith. ACE countered that the clear language of the policies showed that the $300,000 limit applied per term, for a total coverage of $600,000, and that the asbestos claims constituted a single accident or occurrence and, therefore, that the limits had been exhausted on that basis as well. Clearly an annual aggregate limit would drastically expand ACE's liability exposure.

## II. The Trial Court's Decision and the Appeal

{¶ 8} The trial court granted in part and denied in part both parties' summary-judgment motions, concluding that because the complete contents of the multi-year policies were not available, (1) the term "aggregate" was ambiguous as it related to whether the limit applied per year or per policy; (2) extrinsic evidence was admissible; (3) the extrinsic evidence showed that the contracting parties contemplated that the $300,000 limit would apply per year, for nine years, for a total of $2,700,000 in coverage; (4) the underlying asbestos claims constituted multiple accidents and occurrences; and (5) ACE did not lack good faith in denying coverage.

{¶ 9} Both parties now appeal.

{¶ 10} CIC assigns error to the trial court's entry denying summary judgment on its claim that ACE lacked good faith. ACE cross-appeals, contesting the trial court's conclusions that aggregate meant annual aggregates and that the underlying asbestos claims constituted multiple occurrences.

{¶ 11} We hold that extrinsic evidence was properly considered; that the evidence showed that the aggregates applied annually; that for purposes of determining ACE's coverage, there were multiple occurrences; and that ACE did not lack good faith in denying the higher coverage levels. In affirming the trial court's judgment, we address both parties' assignments of error, pausing first to more fully recite the facts.

## III. Flexo and the Incomplete Three–Year Policies

{¶ 12} Other than two certificates of insurance, ACE could not locate Policy 1. It had originated more than 40 years, and a few different company names, earlier. The certificates contained only basic information about the named insured and the effective coverage date. But ACE is not contesting the trial court's decision that Policy 1 contained an annual-aggregate limit—the policy provided a limit of "$300,000 each accident" for a total of $900,000.

{¶ 13} ACE was able to locate two certificates of insurance that were part of Policy 2. But Policy 2 was incomplete as well.

{¶ 14} Regarding Policy 3, ACE had located parts of that policy, but Policy 3 also remained incomplete. One form, submitted as part of Policy 3, was called the Comprehensive General Liability Form ("the CGL Form"). The CGL Form stated that it had been amended in 1967. The parties agree that the CGL Form was a part of Policy 3, but dispute whether the CGL Form was incorporated into Policy 2. Policy 2 was effective in 1966, and the CGL Form presented by ACE had been amended in 1967. CIC claims that the CGL Form was a sample form and could not have been a part of Policy 2 because, as amended, it did not exist at the time Policy 2 became effective. Policy 3 purported to be a renewal of Policy 2, and ACE claims that because renewal policies are presumed to be renewed on the same terms, the CGL Form was also part of Policy 2.

### IV. Flexo's Liability and the Parties' Duties to Defend

{¶ 15} In the mid–1980s, multiple asbestos claims were filed against Flexo based on allegations that the masks it had manufactured were defective. As Flexo's primary insurer, ACE acknowledged its defense and indemnification responsibilities under the three policies.

{¶ 16} ACE and its predecessors originally treated the policies as annual aggregates rather than term aggregates. Then, in the late 1990s, ACE notified CIC that its policies were term aggregates and that the policy limits were nearing exhaustion. In 2002, CIC objected and requested copies of the policies. ACE provided the partial policies and continued to stand by its term-aggregate position, noting that the express policy provisions and case law supported term, not annual, aggregates.

{¶ 17} ACE had paid $900,000 in indemnity payments in 2004, at which time it asserted that the policies had been exhausted and that it had no further responsibility to defend or indemnify Flexo. CIC filed this declaratory-judgment action in 2004, and shortly after Westfield was dismissed.

{¶ 18} ACE argued that the CGL Form, in combination with the declaration page for Policy 3, proved that Policy 2 and Policy 3 were term aggregates. The CGL Form defines the limits of Policy 3 in this manner:

{¶ 19} "Coverage A . . . total liability of the company for all damages because of bodily injury sustained by two or more persons as a result of any one occurrence shall not exceed the limit of bodily injury liability stated in the declarations as applicable to 'each occurrence.'

{¶ 20} "Subject to the above provisions respecting 'each person' and 'each occurrence,' the total liability of the company for all damages because of (1) all bodily injury included within the completed operations hazard and (2) all bodily

injury included within the products hazard shall not exceed the limit of bodily injury liability stated in the declarations as 'aggregate.' "

{¶ 21} On the declarations page for Policy 3, the limits are described as follows:

| COVERAGES | LIMITS OF LIABILITY | | |
| --- | --- | --- | --- |
| | Each Person | Each Occurrence | Aggregate |
| A-Bodily Injury Liability | $300,000 | $300,000 | $300,000 |
| B-Property Damage Liability | | $300,000 | $300,000 |

{¶ 22} ACE argued that the declarations page for Policy 3, in combination with the CGL Form, limited its liability to $300,000 per term. ACE's rationale was that because no document referred to the $300,000 aggregate as an annual aggregate, the aggregate limits applied on a term basis.

{¶ 23} CIC claimed that Policies 2 and 3 were incomplete, silent on the issue, and ambiguous, and that any ambiguity should be construed in favor of coverage. We initially note that the interpretation of an insurance policy and the issue of ambiguity are matters of law.[1] And summary-judgment decisions are reviewed de novo.[2]

## V. The Lost Policies

{¶ 24} The trial court concluded that the meaning of the word "aggregate" was ambiguous when "the [c]ourt does not have the document at issue." And because "aggregate" was ambiguous, extrinsic evidence was necessary for a fair and just resolution. We agree, and for the following reasons, we hold that extrinsic evidence was properly considered.

{¶ 25} ACE argued that the word "aggregate" was unambiguous, that the absence of "annualization" language did not render the policy ambiguous, and that the absence of such language actually meant that the coverage limit applied on a term basis. ACE advanced this position despite the fact that at least one ACE employee conceded that the policy was silent on the issue whether the limits applied per term or per year: "We are taking the position that limits apply to term. Policy language is silent on this issue." Likewise, our review of the partial multi-year policies does not reveal whether the limits applied per year or

---

1.  See *Sharonville v. Am. Emps. Ins. Co.*, 109 Ohio St.3d 186, 2006-Ohio-2180, 846 N.E.2d 833, at ¶ 6, citing *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph one of the syllabus. See also *State ex rel. Fisher v. Okum's Furniture & Appliance Co., Inc.* (Sept. 27, 1995), 1st Dist. No. C–940254, 1995 WL 566633.

2.  See *Doe v. Shaffer* (2000), 90 Ohio St.3d 388, 390, 738 N.E.2d 1243.

per term, and in this respect, we emphasize that only portions of the multi-year policies have been produced.

{¶ 26} When an insurance policy has been lost or destroyed, coverage may be proved by evidence other than the policy itself when the loss or destruction is not attributable to bad faith on the part of the proponent of the document.[3] Contract terms are to be given their plain and ordinary meaning.[4] If a court concludes that a provision is susceptible to more than one reasonable interpretation, then it is entitled to resort to extrinsic evidence to determine the provision's meaning.[5] And "[w]here provisions of a contract of insurance are reasonably susceptible of more than one interpretation, they will be construed strictly against the insurer and liberally in favor of the insured."[6] Moreover, contract terms and provisions are liberally interpreted in favor of the nondrafting party.[7]

{¶ 27} We are convinced that "aggregate" as used in the partial multi-year policies was ambiguous and that extrinsic evidence had to be used to decipher the contracting parties' intent.

{¶ 28} In multi-year insurance policies where the policies are incomplete, the very absence of a limiting modifier is precisely what makes the word "aggregate" ambiguous as to how the limits should be applied.

{¶ 29} An aggregate limit is "the maximum limit of coverage available under a liability policy during a specified period of time * * * regardless of the number of claims that may be made."[8] Where a multi-year policy is incomplete and is without language specifying a period of time, "aggregate" is reasonably susceptible to either modifier and is semantically ambiguous as it relates to the policy limits.

---

**3.** See *Sharonville v. Am. Emps. Ins. Co.*, 109 Ohio St.3d 186, 2006-Ohio-2180, 846 N.E.2d 833, at ¶ 19, citing Evid.R. 1004.

**4.** See *Gomolka v. State Auto. Mut. Ins. Co.* (1982), 70 Ohio St.2d 166, 167–168, 24 O.O.3d 274, 436 N.E.2d 1347.

**5.** See *Ruehl v. Air/Pro, Inc.*, 1st Dist. Nos. C–040339 and C–040350, 2005-Ohio-1184, 2005 WL 627789, at ¶ 9.

**6.** See *United States Fid. & Guar. Co. v. Lightning Rod Mut. Ins. Co.* (1997), 80 Ohio St.3d 584, 586, 687 N.E.2d 717, citing *King v. Nationwide Ins. Co.* (1988), 35 Ohio St.3d 208, 519 N.E.2d 1380, syllabus.

**7.** See *Farmers Natl. Bank v. Delaware Ins. Co.* (1911), 83 Ohio St. 309, 94 N.E. 834.

**8.** See Rupp, Insurance and Risk Management Glossary (1991) 19; see also *Cincinnati Ins. Co. v. Television Engineering Corp.* (E.D.Mo.2002), 265 F.Supp.2d 1078, 1081.

{¶ 30} The ambiguity is especially apparent when there are, as here, a series of multi-year policies. The very existence of multi-year policies likewise cuts against the argument that "aggregate" standing alone (without adding "annual" or "term") is unambiguous as to the policy limits.

{¶ 31} Policy 2 and Policy 3 are incomplete or partially lost. Our review of the available secondary evidence helps little in determining whether "aggregate" refers to term aggregate or annual aggregate. Four factors contribute to the permissibility of extrinsic evidence: (1) these were multi-year policies, (2) the policies were incomplete, (3) aggregate was not defined, and (4) the available segments were ambiguous and unclear as to whether "aggregate" was contemplated to mean annual aggregate or term aggregate. Said otherwise, in these incomplete multi-year policies, in the context of the four corners of the available documents, the noun "aggregate" is equally susceptible to either a term or an annual modifier. Had these policies been single-year, rather than multi-year, the meaning of "aggregate" would have been unambiguous—but that was not the case. In this instance, the trial court correctly admitted extrinsic evidence to clarify the ambiguity.

## VI. The Extrinsic Evidence Favored CIC

{¶ 32} In support of its contention that the aggregate limit applied annually, CIC presented explanatory evidence showing that (1) ACE and its predecessors had treated the policies as annual aggregates, (2) standard industry practice was to treat aggregates in multi-year policies as annual, not term, aggregates, and (3) the premiums paid by Flexo indicated annual aggregates. We discuss CIC's extrinsic evidence in turn.

## VII. Performance after Formation

{¶ 33} CIC asserted that ACE's claims handlers had treated the limits as annual aggregates for over a decade. When an ambiguity exists, the court may consider the parties' course of performance in determining their intent.[9] If the words used in a contract are susceptible to more than one meaning, and the signatories in carrying out the contract have by subsequent acts placed their own interpretation on the meaning of the words, courts may adopt the interpretation that the signatories to the contract have themselves made.[10] An insurer's course of performance in carrying out its policy is instructive on the contracting parties' intent: "If a court is genuinely interested in what the parties

---

9. See *Gammell v. Strategic Mtge. Servs.* (Dec. 31, 1997), 2nd Dist. No. 16531, 1997 WL 797706.

10. See *Courtright v. Scrimger* (1924), 110 Ohio St. 547, 144 N.E. 294.

to a contract meant, 'there is no surer way to find out * * * than to see what they have done.' "[11] We are mindful that neither appealing party was present when the policies were created, but they stand in the shoes of their predecessors—and we believe that both ACE and its predecessors' subsequent performance is helpful.

{¶ 34} In an asbestos-account report dated December 31, 1989, ACE's predecessor AETNA listed nine years of annual aggregates for a total of $2.7 million in coverage. We note that AETNA was a party to the original policy, so, in the interpretation of the policy, its subsequent performance is given greater weight than its successors. In an interoffice memo dated November 11, 1992, ACE's predecessor CIGNA noted that the limit of the Flexo policies was a total of $2.7 million: "CIGNA has nine years of coverage on this account with $300,000 per year for a total of $2,700,000. Indemnity payments total $144,752, leaving available limits of $2,555,248 on CIGNA's part." And finally, ACE records showed nine different entries into its computer system (one per year of coverage), each having its own aggregate total.

{¶ 35} The foregoing reflects only a small sample of the evidence presented by CIC showing that ACE and its predecessors had treated the aggregates as annual. It was their original interpretation, it makes sense, and we think they should stick to it.

{¶ 36} In rebuttal, ACE claimed that the entries reflecting annual aggregates were mistakes. ACE treated the policies as annual aggregates until about the mid–1990s. In 1994, Ann Mooney was assigned to the Flexo account. At the time, she was not a claims adjustor and had no formal training, professional certifications, or licenses. Several years later, Mooney was promoted to claims adjustor, and she then decided that the policies contained term limits—thereby reducing ACE's exposure by $1,800,000. Mooney concluded that the internal reporting systems used by ACE's predecessor had been incorrectly treating the policies as annual aggregates rather than term aggregates. Based on this conclusion, Mooney corrected the "erroneous system entries." Mooney asked for no legal opinion and consulted no experts—she just decided on her own to save the company $1,800,000 in coverage and about $10 million in defense costs. Again, ACE defended its modified position by classifying the various statements, documents, and entries presented by CIC as "mere mistakes."

## VIII. Insurance Industry Norms

{¶ 37} CIC also presented evidence that the insurance industry treated multi-year policies as annual aggregates, not term aggregates. ACE's predecessor

---

11. See *Am. Home Prod. Corp. v. Liberty Mut. Ins. Co.* (S.D.N.Y.1983), 565 F.Supp. 1485, 1503, quoting *Brooklyn Life Ins. Co. of New York v. Dutcher* (1877), 95 U.S. 269, 273, 24 L.Ed. 410.

AETNA had been a member of the Insurance Ratings Board ("IRB") since at least 1967. At the time, the CGL Form had not included a temporal element for aggregates because one-year policies, not multi-year policies, were the industry standard.

{¶ 38} CIC also produced testimony that the contracting parties intended to, and did, follow the IRB rules when drafting policies. The IRB manual stated that a three-year policy applied separately to each annual period in the same manner as a one-year policy. In fact, ACE's own expert testified that ACE's predecessors followed the IRB and that the IRB applied aggregate limits on an annual, rather than on a term, basis where multi-year policies were involved. This too suggested that the aggregates were meant to be annual rather than term.

## IX. The Premiums

{¶ 39} CIC also argued that the premiums charged by ACE were consistent with $300,000 annual aggregate limits when compared to the premiums charged by Westfield. Evidence of premiums can be probative of how the parties construed the insurance contracts.[12]

{¶ 40} CIC introduced evidence showing that the subsequent Westfield insurance premiums mirrored ACE's premiums almost exactly. The Westfield premium was $2,289, whereas ACE's earlier premium was $2,394—a difference of $105. But Flexo's Westfield policy explicitly provided for a $300,000 limit that applied annually for three years, totaling $900,000. But if we are to believe ACE, Flexo paid $105 more for an ACE multi-year policy that provided coverage totaling only $300,000. Common sense seems to dictate that Flexo would not have paid $105 more for an ACE policy that provided one-third of the coverage. We are, of course, mindful that courts should be cautious when comparing insurance premiums to ascertain the contracting parties' intent.

{¶ 41} We hold that the subsequent performance of the parties, industry norms, and the premiums paid all strongly suggest that the parties intended for Policy 2 and Policy 3 to apply annual-aggregate limits. And without having found clear and unambiguous language to the contrary, we hold that the parties intended Policy 2 and Policy 3 to provide annual-aggregate coverage totaling $1,800,000. We note that this holding does not contradict any of the terms of the partial multi-year policies that are available for review. Of course, if the policies are ambiguous—which they are—they should be construed against the drafter in any event. The persuasive evidence offered by CIC serves to ice the cake.

---

12. See *Am. Home Prod. Corp.*, 565 F.Supp. at 1506.

{¶ 42} But even if total coverage was $1,800,000, that total amount may be reduced by the policies' accident or occurrence limitations.

## X. The Asbestos Claims—Single or Multiple Accidents or Occurrences?

{¶ 43} According to ACE, under the cause test, Flexo's manufacture and sale of the defective masks constituted the single accident or occurrence giving rise to the asbestos suits, and its liability had been exhausted under the single-accident/occurrence terms of the policies. Conversely, CIC argued that the injuries resulting from asbestos exposure resulted from multiple accidents or occurrences. The trial court agreed with CIC in concluding that there were multiple accidents or occurrences under the policies.

{¶ 44} Again, ACE's CGL Form stated that the "total liability of the company for all damages because of bodily injury sustained by two or more persons as a result of any one occurrence shall not exceed the limit of bodily injury liability stated in the declarations as applicable to 'each occurrence.'" And the declarations page limited liability to $300,000 for each occurrence. An occurrence was defined as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury * * * neither expected nor intended from the standpoint of the insured." "Bodily injury" was defined as "bodily injury, sickness or disease sustained by any person." In short, the policies' definition of occurrence was an accident that resulted in injury to any person.

{¶ 45} Both ACE and CIC have cited multiple cases in support of their divergent positions on the number of occurrences. In arguing that Ohio courts determine the number of "accidents" or "occurrences" by using the "cause test," ACE cites *Progressive Preferred Ins. Co. v. Derby*.[13] Under the cause test, the number of occurrences is determined by reference to the cause or causes of the damage or injury, rather than by the number of individual claims.[14] In *Progressive*, a driver ran over a woman twice within seconds, and the court held that under the definition of the word "accident" in the commercial-motor-vehicle policy, hitting the plaintiff twice constituted one accident, not two.

{¶ 46} But the *Progressive* case illustrated the typical situation where a single-car accident results in multiple claims. *Norfolk & Western Ry. Co. v. Acc. & Cas. Ins. Co.* is instructive in this regard.[15] In that case, a railroad sued its excess

---

13. See *Progressive Preferred Ins. v. Derby* (June 15, 2001), 6th Dist. No. F–01–002, 2001 WL 672177.

14. See *Internatl. Surplus Lines Ins. Co. v. Certain Underwriters & Underwriting Syndicates at Lloyd's of London* (S.D.Ohio 1994), 868 F.Supp. 917.

15. (W.D.Va.1992), 796 F.Supp. 929.

insurer to pay for claims arising out of noise-induced hearing loss. The railroad argued that only one "event" had occurred under the policy—the railroad's failure to protect its employees from excessive noise. The court, in rejecting the railroad's argument, concluded that strict application of the cause test could lead to an illogical outcome: "The difficulty that the court has with [the cause test] is that it leads to a result which would defy common sense. The typical single occurrence giving rise to multiple claims is the automobile accident which gives rise to a chain of events which results in injury to several parties * * *. In this case, a wide variety of machines in a number of different locations created a variety of sounds over the course of a number of years. Railroad employees working near these machines suffered injury to their hearing as a result of exposure to these sounds * * *. While the railroad's negligence may indeed have been a cause of the injuries, calling that negligence the single occurrence out of which the claims arose is nonsensical."[16]

{¶ 47} This case concerns neither a car accident nor motor-coverage insurance. Rather this case involves comprehensive general liability policies. And those policies covered multiple asbestos claims spanning many years, over a broad geographic area, under a multitude of unrelated circumstances, and the injuries were caused by a plethora of different asbestos-related exposures. The *Progressive* case is factually inapposite.

{¶ 48} ACE also cites *Internatl. Surplus Lines Ins. Co. v. Certain Underwriters & Underwriting Syndicates at Lloyd's of London* in arguing that the number of occurrences is determined by reference to the cause or causes of the damage or injury.[17] The *Internatl. Surplus* court held that numerous product-liability suits involved one "occurrence" for purposes of a $1–million deductible. In this case, we interpret "occurrence" not for the purpose of deciphering a deductible, but rather to determine the scope of ACE's liability.

{¶ 49} The policy interpreted in *Internatl. Surplus* defined "occurrence" as "[a]n accident, event or happening including continuous or repeated exposure to conditions which results, during the policy period, in personal injury * * *. All such personal injury * * * caused by one event or by continuous or repeated exposure to substantially the same conditions shall be deemed to result from one occurrence." To reiterate, the policies at issue here define an occurrence as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury * * * neither expected nor intended from the standpoint of the insured." We note that the definition of "occurrence" here

---

**16.** See *Babcock & Wilcox Co. v. Arkwright–Boston Mfg. Mutl. Ins. Co.* (C.A.6, 1995), 53 F.3d 762, quoting *Norfolk & Western Ry. Co. v. Acc. & Cas. Ins. Co.,* supra.

**17.** See *Internatl. Surplus,* supra, 868 F.Supp. at 922.

differs drastically from that in *Internatl. Surplus*. We reject ACE's assertion that Flexo's manufacture and sale of the defective masks constituted the single accident or occurrence giving rise to the asbestos suits, and we adopt instead the analysis and conclusion of the United States Sixth Circuit Court of Appeals in *Babcock & Wilcox Co. v. Arkwright–Boston*.[18]

{¶ 50} In *Babcock & Wilcox*, the court concluded that each boilerworker's exposure to asbestos was a separate occurrence and rejected the manufacturer's claim that its decision to use asbestos in its boilers was the occurrence.[19] The court in *Babcock & Wilcox* quoted and relied on *Pittsburgh Corning Corp. v. Travelers Indemn. Co.*[20] *Pittsburgh Corning* was another asbestos case, where Pittsburgh Corning manufactured a product called Unibestos. The policy defined "occurrence" as "one happening or a series of happenings arising out of or resulting from one event taking place during the term of this policy." Travelers argued that the cause of all injuries was Pittsburgh Corning's manufacture and sale of asbestos. The court rejected that argument, stating this: "Pittsburgh Corning is being sued by thousands of claimants alleging exposure to Unibestos on hundreds of job sites, on thousands of different dates, and under a variety of conditions over a period of six years. Not everyone exposed to asbestos is affected and not all claimants were exposed under the same circumstances or to the same lot of asbestos. I hold that the 'cause' of the injuries in question is the exposure of each individual to asbestos. That exposure thus constitutes an occurrence for the purposes of determining the number of occurrences."[21]

{¶ 51} Perhaps most damning to ACE's argument that the manufacture and sale of defective masks was the occurrence or accident is its own definition of "occurrence." The policy explicitly provides that an occurrence includes "injurious exposure to conditions" that causes bodily injury. Thus, under the explicit terms of the policy, there had been multiple occurrences because there had been multiple injurious exposures to conditions that had caused bodily injury. Under this definition of occurrence, ACE's position that the occurrence or accident was Flexo selling or manufacturing the defective masks is significantly weakened.

{¶ 52} In light of the policies' express language and the reasoning of the *Babcock & Wilcox* court, we likewise hold that each individual exposure to asbestos, and the resulting injury, constituted a separate accident or occurrence.

---

18. See *Babcock & Wilcox Co. v. Arkwright–Boston Mfg. Mutl. Ins. Co.,* supra.

19. See id.

20. (Jan. 21, 1988), E.D.Pa. No. 84–3985.

21. See *Babcock & Wilcox Co.,* 53 F.3d at 768.

And because there have been multiple exposures and injuries under differing circumstances, there were multiple accidents or occurrences.

{¶ 53} ACE also argues that its liability was limited by its deemer clause. ACE's CGL Form contained a deemer clause that stated, "[A]ll bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence." The question we must answer is whether the multiple exposures constituted the "same general conditions" under the deemer clause. We hold that they did not.

{¶ 54} In most asbestos-related cases, courts have considered and upheld similar deemer clauses under a scenario where a company has been sued for manufacturing a product containing asbestos—making the product intrinsically harmful. But our case is factually distinguishable. Here, Flexo's masks were not intrinsically harmful; they failed to protect, and that failure to protect led to a multitude of physically and temporally distinct injuries under a multitude of differing factual scenarios that did not constitute the "same general conditions" contemplated under the plain language of the deemer clause.[22] For example, exposure occurred in myriad circumstances: exposure to differing levels and in differing times, in many locations, and from many sources. Some undoubtedly experienced a single exposure to a single continuous source. Others were injured from repeated exposure to the same source, and yet others became ill from periodic and frequent exposure to various separate sources.

{¶ 55} Moreover, even under the cause test, ACE is liable in full because Flexo manufactured different kinds of defective masks and distributed the masks in multiple shipments to multiple customers—if Flexo had not shipped the masks, no liability could have been incurred because, as mentioned, the masks were not intrinsically harmful.[23] Under these countless factually distinguishable conditions, we are convinced that the differing injuries did not occur under the "same general conditions," and consequently the deemer clause does not limit Ace's liability—it remains $1,800,000, just as ACE had originally asserted.

{¶ 56} We note that in calculating the number of occurrences under an insurance policy, blanket judicial application of any one test could frustrate the contracting parties' intent. Courts must adhere to policy language in making a determination whether the cause test applies. In this fact-specific case, our

---

22. See generally *Dow Chem. Co. v. Associated Indemn. Corp.* (E.D.Mich.1989), 727 F.Supp. 1524, 1530.

23. See generally *Michigan Chem. Corp. v. Am. Home Assur. Co.* (C.A.6, 1984), 728 F.2d 374, 376 and 383.

holding is not in conflict with the express language of the available policies defining occurrence, and it neither offends nor frustrates the parties' intent.

### XI. CIC's Bad–Faith Allegation

{¶ 57} Finally, CIC challenges the trial court's denial of its summary-judgment motion on whether ACE had breached its duty to act in good faith in the processing of its claims. The trial court concluded that ACE's interpretation of "aggregate" in its policies and its assertion that the claims against Flexo constituted one accident or occurrence did not meet the criteria to support CIC's bad-faith claim.

{¶ 58} Under Ohio Supreme Court precedent, an insurer "fails to act in good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated on circumstances that furnish reasonable justification therefore." [24]

{¶ 59} CIC argues that ACE had treated the aggregates as annual aggregates until about the mid–1990s, when it unilaterally changed its treatment of the aggregates to term aggregates. Our review of the record fails to reveal any lack of good faith on the part of ACE. As we have already discussed ad nauseam, the available policies were at least susceptible to interpretation; and neither ACE's interpretation of aggregate nor its one-accident-or-occurrence argument, while bordering on feckless, lacked good faith. And though an insurance company's lack of due diligence in determining the limits of its policies could constitute a lack of good faith—that was not the case here.

{¶ 60} Because the policies were incomplete, the partial multi-year policies were ambiguous and required extrinsic evidence; the evidence revealed that the contracting parties intended the aggregates to apply annually; and the limit of Policy 2 and Policy 3 is $1,800,000. The judgment of the trial court is, accordingly, affirmed.

Judgment affirmed.

HILDEBRANDT and SUNDERMANN, JJ., concur.

---

24. See *Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio St.3d 552, 644 N.E.2d 397.