[Cite as *William Powell Co. v. Onebeacon Ins. Co.*, 2016-Ohio-8124.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| THE WILLIAM POWELL COMPANY, | : | APPEAL NO. C-160291 |
| | | TRIAL NO. A-1109350 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *O P I N I O N.* |
| ONEBEACON INSURANCE COMPANY, | : | |
| | : | |
| Defendant-Appellant, | : | |
| and | : | |
| FEDERAL INSURANCE COMPANY, | : | |
| Defendant-Intervenor. | : | |

Civil Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed in Part, Reversed in Part, and Cause
Remanded

Date of Judgment Entry on Appeal:  December 14, 2016


*Vorys, Sater, Seymour, and Pease L.L.P.*, *Daniel J. Buckley* and *Joseph M. Brunner*,
for Plaintiff-Appellee,


*Collins Roche Utley & Garner, LLC*, *Richard M. Garner* and *Sunny L. Horacek*, for
Defendant-Appellant.

**DEWINE, Judge.**

{¶1}    This is an appeal from a declaratory judgment in an insurance-coverage dispute involving asbestos-related liabilities.   At issue are the terms of multiple insurance policies dating back to the 1950s.   The insurance company appeals, arguing that the trial court construed the policies too generously.

{¶2}    The issues before us include (1) the meaning of an "occurrence" under the policies, (2) whether the limits of three-year policies should be applied annually or over the policy term, (3) whether two "stub" policies which extended for irregular periods of 13 and 14 months should each receive a single limit or two annual limits, (4) whether the parties had modified two of the policies to provide for higher limits than stated on the face of the policies and (5) the propriety of attorney fees awarded to the insured as part of a discovery dispute.

{¶3}    We conclude that the trial court got it right except for its construction of the stub policies as providing for annual limits.  We therefore affirm the judgment in part and reverse in part.

## I. Background

{¶4}    The William Powell Company ("Powell") makes industrial valves.  Some valves manufactured before 1987 contained asbestos.  In 2001, Powell began receiving personal-injury claims emanating from asbestos exposures involving its products.  The claims related to exposures that had occurred from the 1940s through the 1980s and covered a wide geographical area.   The circumstances varied.   Some claimants had worked directly on the valves, while others had prepared and packed or installed replacement gaskets.   There were also claimants who had not worked with Powell's products at all, but rather had been exposed to asbestos by washing a worker's clothing.

{¶5}  Faced with potentially thousands of claims, Powell sought defense and indemnification under various insurance policies.  At issue in this appeal are policies that were written by a predecessor to OneBeacon Insurance Company.  These policies consist of ten different primary-liability policies and three excess-liability policies covering various periods from 1955 to 1977.

{¶6}  The policies are what are known as occurrence-based policies—that is, they provided coverage for any covered incident that "occurs" during the policy period, regardless of when a claim is filed.  Each policy contained a schedule that provided for a limit of liability for each occurrence and in the aggregate.  For example, policy CG426753, in place from 1965-1968, provided:

| LIMITS OF LIABILITY | COVERAGES |
| --- | --- |
| $1,000,000 each person<br><br>$2,000,000 each occurrence<br><br>$2,000,000 aggregate products | B. Bodily Injury Liability—Except Automobile |

{¶7}  OneBeacon initially undertook defense and indemnification under the policies subject to a reservation of rights.  As time progressed—and the magnitude of Powell's asbestos liabilities increased—OneBeacon adopted a more restrictive reading of the coverage available.  Not surprisingly, Powell disagreed with OneBeacon's less generous construction of the policies.

## A. Declaratory-Judgment Action

{¶8}  Things came to a head in 2011, when Powell filed a declaratory-judgment action asking the court to resolve certain disputes relating to the policies.  In the action, Powell asserted that OneBeacon had improperly construed six of the primary insurance policies to provide less coverage than that for which the parties had bargained.  It also

alleged that, in the event that the primary coverage was exhausted, OneBeacon was improperly denying to Powell excess coverage. OneBeacon filed a counterclaim seeking a declaration of the scope of its responsibility under the policies. Both parties ultimately moved for summary judgment.

{¶9} The primary issues raised by the parties in their complaints and summary judgment pleadings related to the following:

- Aggregate or Annual Limits for Three-Year Policies: A number of the policies were issued for three-year terms. Those issued from 1965 onward expressly stated that the policy limits applied annually. Powell asked for a declaratory judgment that the limits in policies issued before 1965 also applied annually, while OneBeacon argued that a single aggregate limit applied to the three-year term of the policies.

- Stub Periods: Two of the policies were for irregular periods (13 and 14 months), because the policies either had been cancelled early or extended. Powell sought a declaration that these policies receive separate annual limits for each year or partial year, while OneBeacon argued that the policies were entitled to only a single limit.

- Increased Limits: Powell requested a declaratory judgment that the parties had increased the limits for two of the policies subsequent to the inception of the policies. OneBeacon argued that the evidence was insufficient to prove an increase.

- Occurrence: In its motion for summary judgment, OneBeacon asked the court to declare the meaning of "occurrence" under the policies. In their initial dealings, the parties had acted under the assumption

4

that each individual's exposure to a Powell product constituted an "occurrence." In its summary judgment papers, however, OneBeacon argued that the proper meaning of occurrence was not an individual's exposure but Powell's decision to manufacture and sell products containing asbestos without adequate warnings.

- Allocation: The parties disagreed on the appropriate manner in which to "allocate" losses where an "occurrence" spanned over multiple policy periods. Powell sought a declaratory judgment allowing it to allocate sums expended in relation to any individual injured party to any single "triggered" insurance policy up to the policy limits. OneBeacon argued for a pro rata approach where losses would be proportionally allocated to all insurance policies in effect based upon the duration of the occurrence.

- Excess Insurance: Powell sought a declaratory judgment that in the event the underlying policies were triggered, OneBeacon was required to pay 100 percent of defense costs and 100 percent of settlement costs under the excess policies. OneBeacon, for its part, sought a declaration that the excess policies had not been triggered because Powell had other collectible underlying insurance.

## B. The Record: Missing and Incomplete Insurance Policies and a Stipulation

{¶10} Assembling the insurance policies was a challenge for the parties. A number of the policies were located during the course of litigation. But three policies—all issued before 1965—were lost, and one policy—issued in 1960—was incomplete.

5

{¶11}  The parties filed a stipulation with the trial court regarding all the policies.  For those issued after 1965, the parties stipulated to the coverage limits and attached a copy of the policy's essential provisions.  For the three lost policies, Powell and OneBeacon stipulated to the coverage limits "at [each policy's] inception."  The parties also stipulated to the lost policies' basic coverage forms—for two policies, by referencing a coverage form issued to another company and for the third, by referencing a policy issued to Powell in 1965.  As to the incomplete policy, the parties stipulated to coverage limits and attached "the majority" of the policy's essential provisions.  The stipulation further provided that

> [e]ither party  may submit additional Civ.R. 56 evidence with respect to any stipulated fact, including, but not limited to: evidence that the limits, terms and/or conditions of any particular policy may have changed while that policy was in effect; evidence that the limits of any particular policy applied annually or singularly; evidence that that policy period was extended; and evidence that the policy was canceled.

The insurance policies are set forth in Appendix 1 to this opinion.

### C. The Proceedings Below

{¶12}   The trial court granted in part Powell's motion for summary judgment and denied OneBeacon's motion.  Relying upon our decision in *Cincinnati Ins. Co v. ACE INA Holdings, Inc.*, 175 Ohio App.3d 266, 2007-Ohio-5576, 886 N.E.2d 876 (1st Dist.), it concluded that the pre-1965 insurance policies were ambiguous as to whether the aggregate limit applied annually or to the entire policy period.  It looked to extrinsic evidence and determined that the limits should apply on an annual basis.  The court then moved to the question of whether an "occurrence" means an individual's exposure or the decision to manufacture and sell products containing asbestos.  Again guided by

our decision in *Cincinnati Ins.*, the court determined that an occurrence was each individual claimant's "continued and repeated exposure to [Powell's] asbestos-containing product[s]." *The William Powell Co. v. OneBeacon Ins. Co.*, Hamilton C.P. No. A-1109350, 2013 Ohio Misc. LEXIS 48 (Sept. 12, 2013), quoting *LuK Clutch Systems v. Century Indemn.*, 805 F.Supp.2d 370 (N.D.Ohio 2011). As to the allocation issue, the trial court held that issues of fact precluded summary judgment.

{¶13} OneBeacon appealed. Because the trial court had not decided the allocation issue, we dismissed the appeal for lack of a final appealable order. *See The William Powell Co. v. OneBeacon Ins. Co.*, 1st Dist. Hamilton No. C-130681, 2014-Ohio-3528. After the case's return, the trial court dismissed Powell's claims relating to allocation and the excess insurance for lack of subject-matter jurisidiction, concluding that they were not ripe for review. It granted summary judgment to Powell on its remaining claims and dismissed OneBeacon's claims for lack of subject-matter jurisdiction. Thus, judgment was granted in favor of Powell with respect to the coverage limits of the primary policies and the questions of annualization and multiple occurrences.

{¶14} In the midst of the litigation, a discovery dispute arose between the parties. The trial court granted a motion filed by Powell to compel the production of documents and set a hearing on Powell's request for fees and costs related to its motion. After the hearing, the court concluded that the request for fees was reasonable and ordered OneBeacon to pay attorney fees of $34,787.50 to Powell.

{¶15} OneBeacon now appeals, raising two assignments of error. The first assignment is directed at the court's decision to grant Powell's motion for summary judgment and to deny OneBeacon's motion. The second takes on the fee award.

7

## II. We Uphold the Court's Summary-Judgment Decisions with One Modification

{¶16}   Within its first assignment of error, OneBeacon challenges the trial court's decisions that Powell's asbestos-exposure liability arose from multiple occurrences, that the aggregate limits should apply annually and that the aggregate limits of two of the policies had been increased from their initial amounts.  The insurer also objects to the court's refusal to declare that the excess policies had not been triggered.

### A. Powell's Liability Arose from Multiple Occurrences

{¶17}   We begin with the application of the policy term "occurrence" to injuries arising from asbestos exposure.  Each policy provided a per-occurrence and an aggregate limit.  Powell takes the position that each individual's exposure to asbestos constitutes an occurrence.  OneBeacon, on the other hand, argues that Powell's liability stemmed from a single occurrence—the decision to manufacture and sell asbestos-containing products without providing adequate warnings.  Who is right presents a threshold question in the sense that if OneBeacon is correct and there is only one occurrence, the aggregate limits are never implicated.

{¶18}   Ultimately, the issue is one of contract interpretation, so we look to the language of the policies.  The policies issued prior to 1968 did not define occurrence.  Beginning in 1968, however, the policies defined occurrence as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured."  These policies also contained a clause—called a "deemer clause" because it deems when an injury occurs—which provided that "all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence."

{¶19} We certainly are not the first court to confront the application of occurrence-based policy language to asbestos exposure. Over the past 30 years, as asbestos liabilities have reached magnitudes never imagined by insurers or insureds, courts have struggled with how to count occurrences. *See* Stempel*, Assessing the Coverage Carnage: Asbestos Liability and Insurance After Three Decades of Dispute*, 12 Conn.Ins.L.J. 349 (2005/2006). Courts generally have applied one of three theories to identify an occurrence: a theory that looks to the underlying "cause" of the accident, a theory that focuses on the "effect" of the accident, or a theory that looks to the "triggering event" that caused liability. *Metro. Life Ins. Co. v. Aetna Cas. & Sur. Co.*, 255 Conn. 295, 313, 765 A.2d 891 (2001).

{¶20} OneBeacon contends that Ohio courts apply the causation theory. Under this approach, "the number of occurrences is determined by reference to the cause or causes of the damage or injury, rather than by the number of individual claims." *Cincinnati Ins.*, 175 Ohio App.3d 266, 2007-Ohio-5576, 886 N.E.2d 876, at ¶ 45. OneBeacon identifies the underlying act that was the proximate cause of injury as Powell's decision to sell asbestos-containing products without adequate warnings. It analogizes the situation to a car accident that causes injuries to multiple people. There, the occurrence is not the injuries but the car accident itself. In support of its argument, OneBeacon cites numerous cases that have applied this approach to a variety of tort claims. *See, e.g., Banner v. Raisin Valley, Inc.*, 31 F.Supp.2d 591 (N.D.Ohio 1998); *Greater Cincinnati Chamber of Commerce v. Ghanbar*, 157 Ohio App.3d 233, 2004-Ohio-2724, 810 N.E.2d 455 (1st Dist.); *Progressive Preferred Ins. Co. v. Derby*, 6th Dist. Fulton No. F-01-002, 2001 Ohio App. LEXIS 2649 (June 15, 2001).

{¶21} In addressing the issue, we must be guided by our own precedent. In *Cincinnati Ins.*, the insured was a manufacturer of protective masks that were allegedly

defective for not protecting users from asbestos exposures. We found the causation theory inapplicable to the exposures that caused injury in that case. We noted that the case did not concern a car accident, but rather "multiple asbestos claims spanning many years, over a broad geographic area, under a multitude of unrelated circumstances, and [] injuries [caused] by a plethora of different asbestos-related exposures." *Cincinnati Ins.* at ¶ 47. Rather than the causation theory, we adopted the "triggering-event" theory discussed in *Babcock & Wilcox Co. v. Arkwright-Boston Mfg. Mut. Ins. Co.*, 53 F.3d 762 (6th Cir.1995). There, the court held that the event that triggered liability was "exposure to asbestos, not a more remote cause such as Babcock's decision to use asbestos or its failure to warn." *Id.* at 769.

{¶22} Importantly, Our decision in *Cincinnati Ins.* was anchored in not only the "triggering-event" theory, but also the policy language. We found the policy definition of occurrence "most damning" to the insurer. *Cincinnati Ins.* at ¶ 51. As in OneBeacon's policies, the language explicitly defined an occurrence to include " 'injurious exposure to conditions' that cause bodily injury." *See id.* Thus, "under the explicit terms of the policy, there [were] multiple occurrences because there [were] multiple injurious exposures to conditions that [caused] bodily injury." *Id.*

{¶23} Nonetheless, OneBeacon argues that *Cincinnati Ins.* is distinguishable. It cites our statement that the masks were "not intrinsically harmful" but rather "they failed to protect, and that failure to protect led to a multitude of physically and temporally distinct injuries under a multitude of differing factual scenarios that did not constitute the 'same general conditions' contemplated under the plain language of the deemer clause." *Id.* at ¶ 54. In contrast, OneBeacon argues that the products manufactured by Powell were intrinsically harmful so the deemer clause should apply. We are not convinced. Regardless of whether the products were intrinsically harmful,

10

the deemer clause only applies to exposures to the "same general conditions." Here, the exposures were from different products, used in different manners, in different worksites, in different temporal periods. Just as in *Cincinnati Ins.,* the exposures to Powell products "under a multitude of differing factual scenarios" did not constitute the "same general conditions."

{¶24} We do not believe a different result is warranted for the pre-1968 policies that did not include a definition of occurrence. The approach taken in *Cincinnati Ins.* has been utilized by other courts, even in the absence of a definition for "occurrence." In *Metro. Life*, 255 Conn. 295, 765 A.2d 891, the court was faced with a policy that did not define "occurrence." Relying on the triggering-event theory, the court in *Metro. Life* rejected an argument that liability stemmed from a failure to warn about asbestos exposure. Instead, the court concluded that it was "clear * * * that exposure to asbestos was the immediate event that caused the claimants' injuries. Indeed, the 'last link in the causal chain' leading to Metropolitan's liability was the claimants' exposure to asbestos." *Id.* at 322.

{¶25} Thus, we conclude that *Cincinnati Ins.* controls. An occurrence constitutes each individual claimant's exposure to asbestos.

### B. The Question of Annualization

{¶26} Because we have determined that individual asbestos-exposure claims constitute multiple occurrences, we must address the question of whether policies purchased prior to 1965 provide for annual aggregate limits.

### 1. The Pre-1965 Policies are Ambiguous

{¶27} It is undisputed that, beginning in May 1965, the primary policies provided for annualization of the aggregate limits. Policy CG426753, effective May 4, 1965, stated in part "[a]ggregate limits of liability stated in this policy shall apply

11

separately to each annual period." Subsequent three-year policies contained similar language. But, as stipulated by the parties, the basic policy forms for the policies that were effective before May 1965 did not include annualization language.

{¶28} OneBeacon argues that the pre-1965 language stipulated to by the parties plainly provides for a single aggregate limit. The policies contained the following, or similar, language:

> [T]he limit of such liability stated in the declarations as applicable to 'each occurrence' is * * * the total limit of the company's liability for all damages * * * arising out of bodily injury, sickness or disease, including at any time resulting therefrom, sustained by two or more persons in any one occurrence.

> The limits of bodily injury liability * * * stated in the declarations as 'aggregate products' are respectively the total limits of the company's liability for all damages arising out of the product hazard.

OneBeacon reasons that because the policies refer to a "total limit" and there is no mention of annualization, the pre-1965 policies provide only a single aggregate limit.

{¶29} The position advocated by OneBeacon is not without support in the caselaw. As one court has explained, allowing extrinsic evidence of annualization of multi-year limits "would serve only to alter the plain terms of the contract by adding the word 'annual' where it simply does not otherwise exist." *Maryland Cas. Co. v. W.R. Grace & Co.*, S.D.N.Y. No. 88 Civ. 2613, 1996 U.S. Dist. LEXIS 4500, * 15 (Apr. 11, 1996). *See Union Carbide Corp. v. Affiliated FM Ins. Co.*, 68 A.D.3d 534, 535, 891 N.Y.S.2d 347 (2009).

{¶30} But in deciding this issue, we must be guided by our own precedent. In *Cincinnati Ins.*, 175 Ohio App.3d 266, 2007-Ohio-5576, 886 N.E.2d 876, at ¶ 26, we

were likewise presented with multi-year insurance policies that provided for an aggregate limit. As in our case, full copies of the insurance policies were not available. We held that "aggregate" as used in the partial multi-year policies "was ambiguous and that extrinsic evidence had to be used to deciper the contracting parties' intent." *Id.* at ¶ 27. We explained that "[i]n multi-year insurance policies where the policies are incomplete, the very absence of a limiting modifier is precisely what makes the word 'aggregate' ambiguous as to how the limits should be applied." *Id.* at ¶ 28. Thus, we looked to extrinsic evidence and determined that the aggregate amount applied annually. *Id.* at ¶ 60.

{¶31} As in *Cincinnati Ins.*, each of the four multi-year policies issued before 1965 is missing or incomplete. And in our view, the doctrine of stare decisis dictates that we adhere to our holding in *Cincinnati Ins.* Stare decisis "provides continuity and predictability in our legal system, * * * thwart[s] the arbitrary administration of justice [and] provide[s] a clear rule of law by which the citizenry can organize their affairs." *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 43. We find no compelling reason to depart from the doctrine in this case. Thus, finding *Cincinnati Ins.* to be controlling, we conclude that the word "aggregate" in the incomplete pre-1965 policies is ambiguous and that we must look to extrinsic evidence to resolve the ambiguity.

### 2. Resolving the Ambiguity

{¶32} In *Cincinnati Ins.*, we looked to three categories of evidence to resolve the ambiguity: (1) performance after formation, (2) insurance industry norms and (3) premiums paid for the policies. *Cincinnati Ins.* at ¶ 32. The record here contains the same types of evidence.

### a. Performance After Formation

{¶33} Perhaps the strongest evidence for annualization is that from the time of Powell's first claim in 2001 up until 2009, OneBeacon treated the policies as providing for annual limits. Even post-contract formation conduct has been said to be relevant in construing ambiguous contractual language. Thus, where terms are reasonably susceptible to more than one interpretation and "the parties to such contract have by their acts and conduct in the performance of the contract over a reasonable period of time mutually adopted one of those interpretations, the interpretation so adopted will be given to those words." *State ex rel. Burgess & Niple v. Linzell*, 153 Ohio St. 545, 93 N.E.2d 9 (1950), syllabus. *See Cincinnati Ins.* at ¶ 33. OneBeacon protests that we should not consider evidence of the parties' conduct because the policies specifically prohibited revisions unless made in writing. But we are not determining whether revisions to the policies were made; we are construing the language initially agreed upon by the parties. And here, evidence of the parties' performance supports annualized aggregate limits.

{¶34} Greg Waymon, an account manager for OneBeacon, was responsible for overseeing the Powell claims from 2002 to 2005. He testified by affidavit that the purpose of the multi-year policies was to secure coverage for three one-year periods. As a result, when he set up the initial defense of Powell's asbestos claims, he interpreted the policies as having separate annual limits of liability. According to Waymon, during the time he oversaw Powell's asbestos claims, no one contested that the multi-year policies were subject to annual limits. The treatment of the pre-1965 aggregate limits as annualized continued after Waymon left OneBeacon. A subsequent account manager, Darilyn Michaud, recorded annual limits of liability for each of the post-1960 policies in an exhaustion chart provided to Powell in March 2009.

14

{¶35} Notwithstanding Waymon's and Michaud's treatment of the aggregate limits as annualized, OneBeacon maintains that the reservation-of-rights letter indicated that OneBeacon considered the aggregate limits to apply per term. The letter provided in part:

> [OneBeacon] policies explicitly provide for specific limits of liability for each occurrence and in the aggregate during a particular policy period. In no event is Powell entitled to coverage under a [OneBeacon] policy for any amount in excess of the specified limits of liability.

Unlike OneBeacon, we do not read this language as addressing whether the aggregate limits were to be applied annually. Notably, OneBeacon continued to treat the limits as annualized after it sent the reservation-of-rights letter in 2002. We conclude that the parties' past performance supports a construction that allows for the annualization of the aggregate limits.

### b. Insurance Industry Norms

{¶36} The customs and practices of the insurance industry also support an annualized aggregate limit construction. As Waymon explained in his affidavit:

> It was [the] custom and practice [of the three insurance companies who were predecessors to OneBeacon] to treat multiyear policies [as] having separate annual limits of liability, rather than having a single non-annualized per policy period limit. In my experience as a claims manager, the purpose of a multiyear policy was to lock in coverage for three one year periods.

This view was echoed by Powell's expert, Douglas Talley, who stated that insurance industry custom was to apply aggregate limits on an annual basis.

15

{¶37} OneBeacon claims that it rebutted Talley's view with the testimony of its own expert, James Robertson. But nothing in Robertson's expert disclosure or deposition addressed industry practice as to the aggregate policy limits for the multi-year pre-1965 policies. The undisputed evidence showed the custom of the insurance industry was to apply aggregate limits annually.

### c. Premiums

{¶38} The final piece of evidence that we looked to in *Cincinnati Ins.* was insurance premiums, though in doing so we were "mindful that courts should be cautious when comparing insurance premiums to ascertain the contracting parties' intent." *Cincinnati Ins.*, 175 Ohio App.3d 266, 2007-Ohio-5576, 886 N.E.2d 876, at ¶ 40. In *Cincinnati Ins.*, policies that explicitly provided for the annualization of aggregate limits cost almost an identical amount as those multi-year policies that did not. *Id.* We explained that "'common sense seems to dictate" that the insured would not have paid approximately the same amount for a policy that provided one-third of the coverage. *Id.* Here, Powell submitted evidence that the pre-1965 policies calculated premiums using the same or similar rates and sales figures as the 1965 policy, which clearly provided for annualized aggregate limits. Powell was paying an almost identical yearly premium rate for the pre-1965 policies and the 1965 policy. Despite OneBeacon's protest that the similarity in premiums is merely a reflection of accounting principles, we find the premium evidence to be probative of the annualization question.

{¶39} Thus, after considering the extrinsic evidence, we conclude that the trial court did not err when it determined that the pre-1965 policies provided for annual aggregate limits.

## C. Stub Periods

{¶40}   In addition to the four multi-year policies addressed above, Powell sought a declaration that aggregate limits applied on an annual basis for two policies that covered periods of 13 and 14 months.[1]  The parties refer to these periods as "stub periods."

{¶41}   Policy GLA3716075 was issued as a three-year policy effective May 4, 1968, to May 4, 1971.  But Powell signed a notice of cancellation effective on June 24, 1969, which effectively shortened the term of the policy from three years to 14 months. The policy provides "[i]f this policy is issued for a period of three years, the limits of the company liability shall apply separately to *each consecutive annual period* thereof." (Emphasis added.)   Although the policy was issued for three years, there were no consecutive annual periods.  Rather, there was a one-year period followed by a two-month period.  Because there was not a consecutive annual period, annualization did not apply.

{¶42}   The second policy with a stub period—GLA4345057—was issued for one year and then extended by endorsement for 32 days.  The policy contains the following provision:  "[i]f this policy is issued for a period of three years any limit of the company's liability stated in this policy as 'aggregate' shall apply separately to each consecutive annual period thereof."  Annualization does not apply for two reasons:  it was not issued as a three-year policy, and there were no consecutive annual periods.  The trial court erred when it determined that the aggregate limits applied annually for GLA3716075 and GLA4345057. Rather, each policy should receive a single aggregate limit.

---

[1] The parties also discuss GLA4271741, a primary policy, and X10362, an excess policy.  But the trial court did not make a declaration as to GLA4271741.  And the court's dismissal of Powell's claim regarding the excess policy limits was not appealed.  Thus, neither policy is before us for determination.

## D. Increased Policy Limits

**{¶43}** The parties also disagree about whether the aggregate limits of two policies—CG249982 and CG304557— were increased after the inception of the policies. The parties stipulated to initial aggregate limits of $300,000 for CG249982 and $500,000 for CG304557. But Powell introduced evidence that the limits of both policies had been increased. *See Sharonville v. Am. Emps. Ins. Co.*, 109 Ohio St.3d 186, 2006-Ohio-2180, 846 N.E.2d 833, ¶ 19. OneBeacon contends that the evidence was insufficient to show that the limits for the two policies had increased.

**{¶44}** Before delving into the evidence, we must determine the appropriate standard of proof. "In civil cases, the general rule is that issues of fact are to be determined by the preponderance—the greater weight—of the evidence." *Tupler v. Tupler*, 1st Dist. Hamilton Nos. C-920852 and C-920887, 1994 Ohio App. LEXIS 18, *3-4 (Jan. 12, 1994). OneBeacon, however, maintains that Powell needed to prove any changes in the initial limits by clear and convincing evidence. In support, it cites an 1875 Ohio Supreme Court case requiring a plaintiff alleging the existence of a deed to "clearly and satisfactorily" prove the deed. *Gillmore v. Fitzgerald*, 26 Ohio St. 171 (1875), syllabus. Notwithstanding this authority, we see no reason to depart from the ordinary preponderance-of-the-evidence standard employed in civil cases. Indeed, the Sixth Circuit Court of Appeals, applying Ohio law, has rejected the use of a clear-and-convincing standard for proof of the existence and terms of an insurance policy. *See Lincoln Elec. Co. v. St. Paul Fire & Marine Ins.*, 210 F.3d 672 (6th Cir.2000). In that case, the court noted that while there was "no dispositive statute or Ohio Supreme Court case on point," the preponderance standard "appears to represent the majority rule, and can be said to reasonably anticipate the Ohio Supreme Court's position." *Id.* at 688. We

18

agree and conclude that Powell needed to prove the increased limits by a preponderance of the evidence.

{¶45} To prove the revision of the initial limits, Powell presented correspondence with its insurance broker confirming an increase in aggregate limits for CG249982 from $300,000 to $500,000 and for CG304557 from $500,000 to $1,000,000. OneBeacon presented no evidence to the contrary. Given the undisputed evidence, there remained no question of fact that the policy limits had been raised. The court properly granted judgment on the issue in favor of Powell.

### E. Whether the Excess Policies were Triggered was Not Ripe for Review

{¶46} In its final order, the trial court dismissed the parties' claims for a declaration of their rights under the excess policies. OneBeacon now argues that the court should have declared that its obligations under the excess policies were not triggered until all other collectible insurance has been exhausted. Powell did not appeal the trial court's dismissal of its claim regarding the excess policies.

{¶47} Even as to proceedings seeking declaratory judgments, there must be a genuine controversy "between parties having adverse legal interests, of sufficient immediacy and reality." *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941). "For a cause to be justiciable, there must exist a real controversy presenting issues that are ripe for judicial resolution and which will have a direct and immediate effect on the parties." *Cristino v. Ohio Bur. of Workers' Comp.*, 10th Dist. Franklin No. 13AP-772, 2014-Ohio-1383, ¶ 22. *See Burger Brewing Co. v. Liquor Control Comm.*, 34 Ohio St.2d 93, 97, 296 N.E.2d 261 (1973). To be ripe, a declaratory judgment cannot be dependent on the occurrence or nonoccurrence of future events. *Keller v. Columbus*, 100 Ohio St.3d 192, 2003-Ohio-5599, 797 N.E.2d 964, ¶ 26. We apply an abuse-of-discretion standard when reviewing a trial court's

dismissal of a declaratory-judgment claim as not justiciable. *Arnott v. Arnott*, 132 Ohio St.3d 401, 2012-Ohio-3208, 972 N.E.2d 586, ¶ 13.

{¶48}   OneBeacon asked for a declaration that its excess policies were not presently triggered "if there is additional collectible, unscheduled, underlying insurance issued by any insurer." OneBeacon argues that there is at least one other collectible, underlying policy issued by National Union. Powell counters that the National Union policy is an excess—not primary—policy, which would not trigger the other excess policies. The disagreement was never before the trial court for resolution. OneBeacon claimed that it was "not necessary for [the trial court] to make a final determination that the National Union Policy provides coverage [before deciding the summary judgment motion]—only to issue declaratory relief that OneBeacon's defense obligations under its excess policies are not triggered *if* there is other triggered primary insurance." But absent a determination as to the existence of other primary insurance, the excess-insurance question is largely hypothetical. We conclude that the court did not abuse its discretion in finding the issue not ripe for review.

{¶49}   Thus, we sustain the first assignment of error with respect to the annualization of the aggregate limit for the stub periods in policies GLA3716075 and GLA4345057. In all other respects, we overrule the first assignment of error.

### III.  The Second Assignment of Error is Overruled

{¶50}   OneBeacon's second assignment of error challenges the attorney fees awarded for Powell's motion to compel. OneBeacon does not question whether attorney fees were appropriate. Rather, it protests that the record does not support the amount awarded.

{¶51}   In support of its fee request, Powell submitted an invoice that indicated 106.5 hours had been spent on the motion. OneBeacon protests that the ten-page

20

motion filed by Powell did not justify 106.5 hours in attorney time. Apparently much of the attorney time was spent reviewing the documents produced—something OneBeacon says Powell would have had to do anyway. Powell counters that in response to its discovery requests, OneBeacon produced over 20,000 pages of documents, 14,000 pages of which were unresponsive and unrequested. Review of these documents was necessary to prepare the motion to compel, says Powell, because it needed to determine which documents were responsive and which requests remained outstanding.

{¶52} Ordinarily we would tend to agree that the simple review of documents—something that a party would have to do anyway—would not properly be chargeable as attorney fees for a motion to compel the production of additional documents. But this case is a little different. The trial court apparently accepted Powell's argument that OneBeacon's production was so unwieldy that in order to file the motion to compel, Powell was required to expend unusual amounts of attorney time to determine the extent of OneBeacon's compliance with the discovery requests. Discovery is an area where we give particular deference to the trial judge who is familiar with the ins and outs of the parties' conduct in the case. *McCulley v. P.J. Knittel Engraving Co.*, 1st Dist. Hamilton No. C-910644, 1993 Ohio App. LEXIS 506, *6 (Jan. 29, 1993). For this reason, we review fee awards such as this one under the deferential abuse-of-discretion standard. *Berger v. Berger*, 1st Dist. Hamilton No. C-030631, 2004-Ohio-5614, ¶ 8. We find no abuse of that discretion here. The second assignment of error is overruled.

## IV. Conclusion

{¶53} The first assignment of error is sustained with respect to policies GLA3716075 and GLA345057 and overruled in all other respects. The second assignment of error is overruled. We reverse the trial court's judgment with respect to GLA3716075 and GLA345057 and remand the case for the trial court to enter judgment

consistent with this opinion. In all other respects, the judgment of the trial court is affirmed.

Judgment affirmed in part, reversed in part, and cause remanded.

**FISCHER, P.J.,** and **MOCK, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.

Appendix 1

| Years | Policy Number | Amount per occurrence/aggregate |
|---|---|---|
| 5/4/55-5/4/58 | CG249982* | $300,000/$300,000*** |
| 5/4/58-5/4/60 | CG304557* | $500,000/$500,000*** |
| 5/4/60-5/4/63 | CG348800** | $1 million/$1 million |
| 5/4/63-5/4/65 | CG372862* | $2 million/$2 million |
| 5/4/65-5/4/68 | CF426753 | $2 million/$2 million |
| 5/4/68-6/24/69 | GLA3716075 | $2 million/$2 million |
| 6/24/69-6/24/72 | GLA3807927 | $500,000/$500,000 |
| 6/24/69-6/24/72 | XC5424 | $5 million/$5 million |
| 6/24/72-6/24/75 | GLA4014464 | $500,000/$500,000 |
| 6/24/72-6/24/75 | XC6867 | $5 million/$5 million |
| 6/24/75-7/26/76 | GLA4345057 | $500,000/$500,000 |
| 6/24/75-8/26/76 | XC10362 | $5 million/$5 million |
| 7/26/76-7/26/77 | GLA4271741 | $1 million/$1 million |

* Lost policy.
** Incomplete policy.
*** Powell argued that the initial aggregate limits of CG249982 and CG304557 were increased to $500,000 and $1 million, respectively.